PER CURIAM.
 

 Appellant, Marshall Lee Gore, was convicted of and sentenced to death for the first-degree murder and armed robbery of Robyn Novick in Dade County, Florida, after his initial conviction and death sentence were overturned.
 
 Gore v. State,
 
 784 So.2d 418, 423 (Fla.2001).
 
 [1]
 
 In this appeal,
 
 *3
 
 we consider the denial of postconviction relief arising from Gore’s motion to vacate his judgment of conviction and sentence of death filed under Florida Rule of Criminal Procedure 3.851. For the reasons set forth in this opinion, we affirm the denial of postconviction relief.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 The relevant facts regarding the murder of Robyn Novick are set forth in this Court’s opinion on Gore’s second direct appeal:
 

 Police discovered Novick’s nude body in a rural area of Dade County on March 16, 1988. Her body was hidden by a blue tarpaulin-like material. Novick suffered stab wounds to the chest and had a belt tied around her neck. According to the medical examiner, Novick died as a result of the stab wounds and mechanical asphyxia. He estimated that Novick was killed between 9 p.m. and 1 a.m. on March 11 into March 12, 1988.
 

 Novick was last seen alive on March 11, 1988, leaving the parking lot of the Redlands Tavern in her yellow Corvette. A witness testified that Novick left with a man, whom the witness identified as Gore.
 

 In the early morning of March 12, Gore was seen driving Novick’s automobile. David Restrepo, a friend of Gore’s, testified that Gore arrived at his home driving a yellow Corvette with a license plate reading “Robyn.” ...
 

 [[Image here]]
 

 In its case-in-chief, the State also introduced Williams[n-2] rule evidence that Gore committed similar crimes against [Susan] Roark and [Tina] Coralis. The State presented evidence that Gore had murdered Roark shortly after her disappearance in January 30, 1988, by inflicting trauma to her neck and chest. In addition, evidence established that Gore stole Roark’s black Ford Mustang and other personal property, then left her nude body in a rural area used as a trash dump. Similarly, the State presented evidence that Gore attacked Cor-alis on March 14, 1988, two days after the murder of Novick. Coralis herself testified against Gore, stating that he beat her with a rock, raped, choked and stabbed her, and left her for dead on the side of the road near the scene where Novick’s body was found. Gore proceeded to steal Coralis’s red Toyota sports car and personal property.
 

 FBI agents finally arrested Gore in Paducah, Kentucky on March 17, 1988. At the time of his arrest, Gore was in possession of Coralis’s red Toyota automobile and he had her bank and credit cards in the pocket of his jacket. Police officers subsequently questioned Gore regarding the Coralis and Roark crimes. According to the police, Gore denied knowing Roark or Coralis and denied all involvement in the crimes. Gore also denied knowing Novick. When police prepared to show Gore a photograph of Novick, Gore stated “just make sure it is not gory” because his “stomach could not take it.” At the time that Gore made such statements, the police had yet to inform Gore that Novick was dead. Detective David Simmons of the Miami Dade Police Department testified that when Gore looked at Novick’s picture, Gore’s eyes “swelled with tears.” Gore also stated that “if I did this, I deserve the death penalty.”
 

 In his defense, Gore took the stand and testified on his own behalf. Gore claimed that prior to his interrogation by police in Miami concerning the No-
 
 *4
 
 vick murder, reporters previously had told him upon his arrest that Novick was dead. He also claimed that during his interrogation, police had placed gruesome photographs of the murders all over the interview room. Moreover, Gore stated that police had given him a polygraph examination, which he claimed he had passed.
 

 Gore testified that he was the owner of an escort service and claimed that Coralis, Novick, Roark, and Restrepo all worked for the escort business. Gore maintained that Novick worked for him as a nude dancer and he admitted that he was with Novick at the Redlands Tavern on the evening of March 11, 1988. Gore, however, denied killing her....
 

 [[Image here]]
 

 On cross-examination, Gore admitted that he previously had been convicted of committing fifteen felonies. Gore denied trying to kill Coralis and claimed that her injuries were the result of her jumping out of a moving car. Gore also asserted that all of the State witnesses had lied and he refused to explain why he was in possession of the property of people who were either killed or attacked.
 

 Ana Fernandez testified on Gore’s behalf. Fernandez worked for Gore in 1984 or 1985 when she was fifteen years old, answering phones for the escort service. Fernandez claimed to have known Roark, Coralis, and Novick through her association with Gore. However, she could not state when, where, or how many times that she had met Coralis or Novick and was unable to describe them. Moreover, when presented with a photograph of several women, she could not identify Coralis.
 

 After the close of all the evidence, the jury convicted Gore of first-degree murder and armed robbery with a deadly weapon of Novick. During the penalty phase, Gore chose to represent himself.
 
 [2]
 

 ] The jury recommended that Gore be sentenced to death by a vote of twelve to zero. The trial court imposed the death penalty for the first-degree murder conviction
 
 [3]
 
 and imposed an upward departure life sentence for the armed robbery conviction to run consecutive to any other sentence Gore was serving.
 

 [N.2]
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959).
 

 784 So.2d at 423-26 (footnotes omitted).
 

 Gore filed his second direct appeal, raising eight claims.
 
 [4]
 
 The Court affirmed
 
 *5
 
 Gore’s convictions and sentence,
 
 id.
 
 at 438, after which Gore filed this current motion for postconviction relief. In his rule 3.851 motion, Gore alleged ten claims.
 
 [5]
 
 Following a
 
 Huff
 

 [6]
 

 hearing, the trial court granted an evidentiary hearing on claim four only — Gore’s ineffective assistance of counsel claim arising from the
 
 Spencer
 
 hearing — and summarily denied Gore’s remaining claims.
 
 [7]
 
 However, the trial court ultimately did not hold an evidentiary hearing on this single claim based on its determination that Gore, by his actions, waived any evidentiary hearing. The trial court thus denied Gore’s motion for post-conviction relief, concluding that all of the claims raised were without merit. Gore appeals the denial of his postconviction
 
 *6
 
 motion to this Court and raises several issues for this Court’s review.
 
 [8]
 

 II. ANALYSIS
 

 A. Competency at Trial and Postconviction Proceedings
 

 We begin with an examination of the issue of Gore’s competency. We start with the issue of competency because Gore’s mental status has been a recurrent theme throughout the trial, direct appeal, and postconviction proceedings in this case as well as in the proceedings concerning the first-degree murder of Susan Roark in Columbia County, in which Gore was also sentenced to death and in which the issue of Gore’s competency to proceed was also raised.
 
 See Gore v. State,
 
 846 So.2d 461 (Fla.2008) (affirming denial of postconviction relief and denying petition for habeas corpus in Roark conviction);
 
 Gore v. State,
 
 599 So.2d 978 (Fla.1992) (affirming conviction and sentence for murder of Roark) (hereafter referred to as “the Columbia County case”).
 
 [9]
 
 While Gore’s current counsel asserts that Gore is “mentally deranged,” the trial judges who have evaluated this issue have concluded that, rather than being incompetent or seriously mentally ill, Gore has intentionally manipulated and attempted to obstruct the ongoing proceedings against him. The question of whether Gore’s actions are the product of a serious mental illness or the result of purposeful manipulation is best analyzed by a thorough review of the record in this case and the Columbia County case.
 
 [10]
 

 Gore’s claims of incompetency arise from both his trial and postconviction pro
 
 *7
 
 ceedings. As to his trial-related claims, Gore asserts the following: (1) the trial court erred in finding that he was competent to proceed to trial; (2) his trial counsel was ineffective in advocating his incompetency claims; and (3) the trial court erred in failing to instruct the jury on the extreme mental disturbance mitigator.
 

 As to his postconviction-related claims, Gore alleges that the trial court erred in finding that he was competent at the time of the postconviction proceedings and he claims that he is possibly incompetent and/or insane at present. To provide context to these claims, we will first provide a history of the competency proceedings in Gore’s case and then analyze his postcon-viction and trial-related incompetency claims.
 

 1.
 
 History of Competency Proceedings
 

 a. Competency in Columbia County Collateral Proceedings
 

 We turn first to the Columbia County case because the proceedings in that case gave rise to some of the trial court’s decisions regarding competency in this case. In 1998, after the filing of Gore’s rule 3.851 motion in the Columbia County case involving the murder of Susan Roark, counsel in that case filed a motion to determine Gore’s competency to proceed. In the motion, counsel stated that Gore had “no present ability to consult with and communicate with postconviction counsel regarding factual matters at issue in his postcon-viction proceedings.” In the absence of the State’s objection to the examination, the court appointed two experts to evaluate Gore’s competency, Dr. Richard Greer and Dr. Umesh Mhatre, who concluded that Gore was competent to proceed. At the competency hearing, Gore had the opportunity to cross-examine these experts and also presented testimony from Dr. Harry MeClaren and Dr. Terence Leland, both of whom found Gore to be incompetent.
 

 In finding that Gore was competent to proceed in the postconviction proceedings, the court noted that two of the doctors had found Gore to be controlling and manipulative. Moreover, the court stated:
 

 Mr. Gore is also a notoriously difficult client. There is, however, no right to a meaningful attorney-client relationship, when the client’s conduct prevents a meaningful relationship.
 
 Morris v. Slappy,
 
 461 U.S. 1, 13, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Based on this Court’s observations of Gore, both during his trial and over the last several years of these postconviction proceedings and the reports and testimony of the experts, the Court finds that Gore’s current dislike of and refusal to cooperate with collateral counsel are not the result of a delusional disorder. Instead, such behavior is consistent with Gore’s personality disorder.
 

 The Court finds that the greater weight of the evidence supports the conclusions that Gore has both a rational and factual understanding of these proceedings and that he has the ability to consult with counsel if he chooses to do so.
 

 b. Competency Evaluation at Retrial in Novick Case
 

 On January 14, 1999, prior to the retrial in this case, defense counsel received a letter stating that Gore had previously been found to be incompetent by two experts in the Columbia County case. When counsel raised the issue before the court, the court sua sponte appointed Dr. Merry Haber to conduct Gore’s evaluation “to make sure [Gore was] okay and still competent.” Counsel then formally requested that the trial court have Dr. Haber perform an evaluation. The parties stipulated
 
 *8
 
 that the defense would not request a second evaluation unless Dr. Haber concluded Gore was incompetent.
 

 On January 15, 1999, Dr. Haber conducted a one-hour competency evaluation of Gore. In addition, Dr. Haber reviewed the reports of the four experts who examined Gore in the Columbia County proceedings. In her report, Dr. Haber opined that Gore “was cooperative, but also manipulative and seductive.” She also stated that his “thought processes were coherent, logical, and productive” although he would become “overproductive” in explaining his situation. Dr. Haber believed that Gore’s thought processes were “goal-oriented with no loosening of associations.” She found no evidence of delusional activity, depression, significant anxiety, or any major mental illness. She ultimately concluded that Gore was competent to proceed with his trial.
 
 [11]
 
 The issue of Gore’s competency was not raised on appeal from the retrial.
 

 c. Competency at Postconviction Proceedings in Novick Case
 

 In this current posteonviction proceeding, Gore filed a motion to determine his competency to proceed in the collateral proceedings. At a subsequent hearing, the State agreed to a competency hearing. Ultimately, the court appointed three experts to evaluate Gore: Dr. Lynne Alison Mclnnes, Dr. Enrique Suarez, and Dr. Sonia Ruiz.
 

 At the competency hearing, the defense presented the testimony of Dr. Mclnnes, a psychiatrist, who conducted a five-hour interview of Gore. She opined that Gore had loosening of association, displayed incoherence, paranoia, and delusional thoughts, and was suspicious of counsel. Dr. Mclnnes did not administer the Minnesota Multiphasic Personality Inventory (MMPI) test to Gore, a test which evaluates personality and “eharacterological” traits, because she did not believe it would be of assistance to the issue of his competency. Gore denied that he had psychiatric symptoms, but Dr. Mclnnes testified that it was very difficult to fake a thought disorder and therefore she did not believe that Gore was malingering. She also did not believe that Gore was capable of conveying consistent information or understanding the facts at hand. Thus, she concluded that Gore was incompetent. On cross-examination, Dr. Mclnnes stated that Gore had indicated that he had suffered some head trauma but she also conceded that there was a possibility that Gore was attempting to produce symptoms to influence the outcome of his case and that she suspected that Gore was manipulative. She also stated that she did not review Gore’s prior evaluations.
 

 The State presented the testimony of Dr. Suarez, a psychologist who performed Gore’s evaluation, and Dr. Ruiz, a clinical psychologist. Dr. Suarez testified that Gore was compulsive and had a tendency to obsess. Gore informed Dr. Suarez that he had a number of different head injuries and had experimented with drugs before prison. However, based on Gore’s interactions with his attorney, who was present during the evaluation, the doctor believed that Gore had the ability to respond to any question that was asked of him. Dr. Suarez also did not see any signs of Gore being psychotic or delusional. Dr. Suarez administered the MMPI, which showed “answers that are known to reflect or be indicative of certain psychological condition or show abnormality.” However, the test results were invalid, which Dr. Suarez opined could have been the result of exag
 
 *9
 
 geration. Ultimately, Dr. Suarez found Gore to be competent. On cross-examination, Dr. Suarez conceded that the MMPI results did not necessarily correlate to an individuars competency.
 

 Dr. Ruiz described Gore as very coherent and intelligent. She stated that Gore was sometimes unresponsive to questions, but she deemed that behavior to be purposeful, occurring when he did not wish to discuss certain topics. She also stated that Gore did not have any loosening of associations but was a highly verbal individual. She opined that Gore obsesses with details but that he was not psychotic, out of contact with reality, or mentally retarded, and showed no evidence of a thought disorder or major mental disorder. She concluded that “[Gore] is very capable of consulting with counsel in a reasonable manner and very capable of testifying if he choosing [sic] to do so.”
 

 Gore himself questioned Dr. Ruiz and asked her if the loosening of associations could exhibit itself on some days but not on others due to the stress on an individual, and she agreed it was a possibility.
 
 [12]
 
 When Gore continued to question her, Dr. Ruiz also stated it was possible that an individual under stress could provide incorrect answers to questions.
 

 After hearing testimony from the doctors and arguments from counsel, the court stated:
 

 I do find Mr. Gore to be competent.... Maybe more competent than a lot of people that appear before me, some of the lawyers included. I find him to be bright, intelligent, he has good contact with reality. He has no communication difficulty. He certainly does not in front of me or with the doctors, at least Dr. Ruiz and Suarez, have any difficulty with rambling or loosening association. I just observed here that he was able to ask a mental health expert a very good question and follow it through the answer to another follow-up question. I thought he did very well there.
 

 Further, when questioned by the court on whether he felt competent to proceed, Gore stated, “I’m absolutely competent. I’m absolutely lucid.”
 

 2. Standard for Competency
 

 Under the Due Process Clause of the Fourteenth Amendment, a defendant may not be tried and convicted of a crime if he is not competent to stand trial.
 
 See
 
 Amend. XIV, § 1, U.S. Const. In order to determine whether a defendant is competent to proceed at trial or in postconviction proceedings, the court must discern whether he “has sufficient present ability to consult with counsel with a reasonable degree of rational understanding — and whether he has a rational as well as a factual understanding of the pending ... proceedings.”
 
 Alston v. State,
 
 894 So.2d 46, 54 (Fla.2004) (quoting
 
 Hardy v. State,
 
 716 So.2d 761, 763 (Fla.1998) (applying competency criteria to collateral proceedings)); see
 
 Peede v. State,
 
 955 So.2d 480, 488 (Fla.2007) (holding that the trial court must decide whether the defendant “has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him”) (quoting
 
 Dusky v. United States,
 
 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960));
 
 see also
 
 Fla. R.Crim. P. 3.211(a)(1) (setting forth the same test).
 

 
 *10
 
 Moreover, when analyzing a competency determination on appeal, this Court applies the competent, substantial evidence standard of review to the trial court’s findings. In other words, a trial court’s determination of competency supported by competent, substantial evidence will not be disturbed on appeal.
 
 See Hernandez-Alberto v. State,
 
 889 So.2d 721, 727-28 (Fla.2004).
 

 3. Analysis of Postconviction and Trialr-Related Competency Claims
 

 Applying this standard and based on the evidence presented to the postcon-viction court on the issue of Gore’s competency, we conclude that competent, substantial evidence supports the postcon-viction court’s finding that Gore was competent to proceed. Although the court heard testimony from Dr. Mclnnes that Gore was incompetent, the court also heard conflicting evidence from Dr. Ruiz and Dr. Suarez that Gore was competent. The trial court also observed Gore’s behavior first-hand and had the benefit of the record from the prior competency proceedings at trial in this case, as well as the Columbia County case. Because the court’s competency determination is supported by the testimony from Dr. Ruiz and Dr. Suarez, the court’s own observations of Gore’s behavior, and the prior proceedings in the Columbia County case, the court did not err in finding Gore competent to proceed in his post-conviction proceedings.
 

 We also reject Gore’s competency claims arising from his retrial. We first note that Gore’s claims alleging that he was incompetent at the time of trial and that the trial court erred in removing the extreme mental disturbance mitigator from the jury instructions are procedurally barred because they could have been raised on direct appeal.
 
 See Carroll v. State,
 
 815 So.2d 601, 610 (Fla.2002) (rejecting as procedurally barred the postconviction claim that defendant was incompetent to stand trial);
 
 see also Farina v. State,
 
 937 So.2d 612, 625 n. 7 (Fla.2006) (argument that age mitigator should be reweighed was procedurally barred as it should have been raised on direct appeal).
 

 As to Gore’s claim that counsel rendered ineffective assistance at his trial in his failure to “advocate the issue of his competency,” we find no merit in this claim. Following the United States Supreme Court’s decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
 

 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted). In this case, the trial court summarily denied this claim without an evidentiary hearing, concluding it was insufficiently pled. In determining whether the trial court’s ruling on the facial sufficiency of this claim was proper, this Court must apply
 
 Strickland’s
 
 two-pronged test.
 
 Spera v. State,
 
 971 So.2d 754, 758 (Fla.2007).
 

 
 *11
 
 Because Gore received a competency evaluation at his trial, this claim is unlike other cases where the defendant alleged that counsel was ineffective in failing to request a competency evaluation.
 
 See Lamarca v. State,
 
 931 So.2d 838, 847-48 (Fla.2006). Instead, Gore argues that counsel failed to further develop the information that Gore had previously been found incompetent by two experts in another case. However, this claim of deficient performance is conclusively refuted by the record in that the record shows that trial counsel brought the fact of the prior experts’ conclusions to the attention of the trial court, who immediately ordered an additional competency evaluation. Subsequently, in an abundance of caution, counsel formally requested that the trial court read the transcript from the Columbia County ease, review the earlier reports on Gore’s competency, and order another competency evaluation.
 

 As to the second prong of prejudice, there is simply no basis to conclude that our confidence in the outcome of the competency proceedings at trial, and ultimately confidence in the trial proceedings, is undermined. This is especially true in light of Gore having been found competent by every trial court that has held a hearing on this issue, including determinations that were made after the extensive proceedings in Columbia County and after the proceedings by the trial court in these postconviction proceedings. Therefore, we conclude that Gore’s claim of ineffective assistance of counsel in failing to “advocate” the issue of competency is without merit.
 

 B. Ineffective Assistance of Counsel at Penalty Phase and Spencer Hearing
 

 We next turn to Gore’s assertion that the trial court erred in summarily denying his ineffective assistance of counsel claim based on its finding that Gore had waived the claim by representing himself at the penalty phase before counsel was reappointed for the
 
 Spencer
 
 hearing. We combine our discussion of this issue with the discussion of Gore’s claim of error in the trial court’s ruling that he had voluntarily waived an evidentiary hearing that was granted on his claim that counsel provided ineffective assistance at his
 
 Spencer
 
 hearing.
 

 1. Summary Denial of Ineffective Assistance Claim
 

 We first address Gore’s claim that the trial court erred in summarily denying his ineffective assistance of counsel claim. We have repeatedly required that an evi-dentiary hearing be held “whenever the movant makes a facially sufficient claim that requires a factual determination.”
 
 See Owen v. State,
 
 986 So.2d 534, 543 (Fla.2008). However, “[p]ostconviction claims may be summarily denied when they are legally insufficient, should have been brought on direct appeal, or are positively refuted by the record.”
 
 Id.
 
 at 543 (quoting
 
 Connor v. State,
 
 979 So.2d 852, 868 (Fla.2007)).
 

 The essence of Gore’s ineffective assistance claim is twofold. First, Gore alleges that an evidentiary hearing was required to determine whether his decision to proceed pro se at the penalty phase was voluntary or forced by counsel’s lack of preparation. Second, Gore argues that even if he had voluntarily dismissed counsel, this factor does not negate counsel’s failure “to prepare mitigation or obtain adequate mental health evaluations.”
 

 On direct appeal, we rejected Gore’s claim that his decision to represent himself was not knowing and voluntary:
 

 [W]e conclude that Gore has failed to show good cause for dissatisfaction with appointed counsel. Despite Gore’s assertions to the contrary, the record reflects that defense counsel spoke with
 
 *12
 
 family members and potential lay witnesses, reviewed existing mental health evaluations, and attempted to have Gore reevaluated by mental health experts for purposes of presenting potential mitigating evidence. Gore himself thwarted Dr. Haber’s efforts to provide mitigating evidence by refusing to cooperate with her, and Gore also refused to be reexamined by several experts who previously had interviewed and examined him for other criminal proceedings. In addition, after speaking with Gore’s family members and lay witnesses about testifying on Gore’s behalf, defense counsel concluded that it would not be in Gore’s best interest to have these witnesses testify during the penalty phase. In sum, the record reflects that defense counsel took reasonable steps to secure mitigating evidence on behalf of Gore and made strategic decisions in declining to call certain defense witnesses.
 

 Thus, the record does not reflect that Gore was forced to make a Hobson’s choice between incompetent or unprepared counsel and appearing pro se.
 
 Competent substantial evidence supports the conclusion that Gore’s decision to proceed pro se was made with “eyes open.”
 

 Gore,
 
 784 So.2d at 437 (emphasis added).
 

 Although we rejected Gore’s argument that Gore’s decision to represent himself was not voluntary, we did not address Gore’s claim that counsel rendered ineffective assistance prior to his discharge because he failed to secure any mental health testimony or fact witnesses to testify on Gore’s behalf. This aspect of his argument, which amounts to a claim of ineffective assistance of counsel at the penalty phase, was raised but not addressed on direct appeal.
 
 See Gore,
 
 784 So.2d at 436.
 
 [13]
 
 While we note that Gore’s ineffective assistance of penalty phase counsel claim is cognizable in postconviction proceedings, in this case the claim is extremely limited because Gore chose to represent himself. Moreover, we reject Gore’s claim that counsel was deficient in failing to prepare mitigation and obtain mental health evaluations because it is conclusively refuted by the record.
 
 See Blackwood v. State,
 
 946 So.2d 960, 966-67 (Fla.2006) (upholding summary denial of defendant’s ineffective assistance claims conclusively refuted by the record).
 

 Contrary to Gore’s assertions about counsel’s deficient performance, our record reflects that in preparation for the penalty phase, trial counsel filed the defense witness list on March 4, 1999, which included the names of seven witnesses. At the March 9, 1999, status hearing, counsel removed the names of two of Gore’s family members because counsel concluded that they would not be favorable witnesses. Counsel also removed Dr. Merry Haber from the witness list, after informing the court that Gore refused to meet with her during their scheduled appointments. Then, on March 10, 1999, counsel filed a memo listing three psychologists who had formerly evaluated Gore, who either did not have the time or did not wish to testify on Gore’s behalf. At the status hearing that same day, Gore informed the court that he wished to represent himself at the penalty phase. He explained:
 

 Mr. Pena [counsel] advised me when I got into this courtroom he was not calling any witnesses at all. He was not going to put on any kind of defense, except me.... That was going to be the whole thing.
 

 
 *13
 
 ... I was told that Ana Fernandez and Jessie Casanova and other people were going to be witnesses here and now, all of a sudden, they are doing it to me again. They done it to me at the first part of this trial ... last minute, seventh hour they are not [sic] witnesses ....
 

 After conducting a thorough colloquy, the court agreed to allow Gore to represent himself during the sentencing hearing. In response, counsel stated to the court that most of the witnesses on the list, including Ms. Fernandez, no longer wished to testify on Gore’s behalf. He also stated that unfavorable evidence would be introduced through the testimony of Ms. Casanova, and therefore declined to present her testimony at the sentencing hearing.
 

 Gore also asserted to the postconviction court that there were “numerous others willing to testify on Mr. Gore’s behalf and who were never called to do so,” including mental health experts Dr. Lee Norton and Dr. Barry Crown. However, in the memo filed on March 10, counsel stated that Dr. Norton found Gore to be difficult and “would not testify in this case under any circumstances.” The letter further stated that Dr. Crown “found [Gore] to be manipulative and self serving” and would not “give testimony which would affect his credibility as a professional.”
 

 As demonstrated by the above, the record conclusively refutes Gore’s claim that counsel’s decision not to present witnesses at the penalty phase was prompted by a lack of preparation. Counsel attempted to obtain the testimony of family members and mental health experts. However, the majority of the witnesses were unwilling to testify in Gore’s case. Based on the record of counsel’s actions at the trial court proceedings before counsel was discharged, we conclude that further factual development of this claim at a hearing was not required. Further, Gore has been unable to point to any other available witness that counsel could have or should have presented at trial so as to undermine our confidence in the outcome of the penalty phase. Thus, we uphold the summary denial on the basis that the record conclusively refutes Gore’s allegations that counsel rendered deficient performance prior to Gore’s decision to proceed pro se and that the record conclusively refutes any possible prejudice.
 

 2. Waiver of Evidentiary Hearing
 

 We now turn to Gore’s claim that the trial court erred in finding that Gore voluntarily waived his evidentiary hearing on his ineffective assistance claim rising from the
 
 Spencer
 
 hearing. Although Gore represented himself during the penalty phase, counsel was subsequently reappointed to represent Gore, but did not present any evidence at the
 
 Spencer
 
 hearing. In its order denying postconviction relief on Gore’s ineffective assistance claim arising from the
 
 Spencer
 
 hearing, the trial court stated:
 

 1. Defendant has a right to control the conduct of his case, and is therefore entitled to determine that no witnesses be called at the evidentiary hearing against his counsel’s wishes. 2. Defendant has the burden of proof in this post conviction hearing and cannot carry that burden of proof without the presentation of witnesses. 3. By refusing to allow the presentation of evidence at the eviden-tiary hearing, Defendant has waived his claim that counsel was ineffective for failing to investigate and present mitigation at the
 
 Spencer
 
 hearing. Because Defendant has waived this claim, it is hereby, denied.
 

 (Citations omitted.)
 

 As to determining whether the trial court erred in finding that Gore waived the only postconviction claim that was granted
 
 *14
 
 an evidentiary hearing, we have held that a valid waiver of postconviction penalty phase claims must be “knowing, intelligent, and voluntary.”
 
 Garcia v. State,
 
 949 So.2d 980, 986 (Fla.2006) (quoting
 
 Alston v. State,
 
 894 So.2d 46, 57 (Fla.2004)). We have carefully reviewed the record and conclude that Gore’s statements at the hearing met this threshold. It is clear from the record that Gore did not want to have an evidentiary hearing on his penalty phase ineffective assistance claim. The State attempted to inform Gore of the consequences of failing to meet his burden of proof.
 
 [14]
 
 However, Gore declared that he did not “care” about the evidentiary hearing, but was concerned solely with proving his innocence.
 
 [15]
 

 As this Court stated in
 
 Ferrell v. State,
 
 918 So.2d 163 (Fla.2005), “Ferrell’s claim of ineffective assistance based on the failure of trial counsel to seek the expert assistance of a social worker is a fact-based issue that required development at an evidentiary hearing.... However, Ferrell ‘opted to forego’ the presentation of such evidence at the scheduled evidentiary hearing and thus waived the claim.”
 
 Id.
 
 at 173-74 (citation omitted). Likewise, Gore’s decision here to “forego” the presentation of evidence at the evidentiary hearing on his
 
 Spencer
 
 claim waived consideration of this claim on appeal. Because the scheduled evidentiary hearing was granted only as to Gore’s penalty phase ineffective assistance claim and Gore was not interested in pursuing his penalty phase claims, we conclude that the trial court did not err in finding that Gore knowingly, intelligently, and voluntarily waived his evidentiary hearing and this postconviction claim.
 
 [16]
 

 Even if the trial court erred in its finding that Gore waived an evidentiary hearing on this claim, we conclude that no prejudice can be demonstrated.
 
 See generally Waterhouse v. State,
 
 792 So.2d 1176, 1182 (Fla.2001) (“[Bjecause the
 
 Strickland
 
 standard requires establishment of both prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.”). Similar to our previous discussion of Gore’s ineffective assistance of counsel at the penalty phase, Gore has not been able to point to any other available witness that counsel should have presented at the
 
 Spencer
 
 hearing that would undermine our confidence in the outcome of his penalty phase. Thus, we find Gore’s claim of error concerning his
 
 Spencer
 
 hearing claim to be meritless.
 

 C. Access to Records
 

 We next address Gore’s assertion that the trial court erred in refusing to allow complete and unfettered access to
 
 *15
 
 available records. Further, Gore contends that the court did not allow counsel adequate time to review the records that were eventually made available to counsel. Gore’s complaint stems from the trial court’s ruling on postconviction counsel’s motion to compel Frank Tassone, postcon-viction counsel in the Columbia County case,
 
 [17]
 
 to allow counsel access to approximately eighty boxes of records.
 
 [18]
 
 Tassone refused counsel’s request to review the files, based on Gore’s direction that counsel should not have access because of a conflict of interest. The court ultimately ruled that counsel could have access to the fifty-nine boxes of materials to which Gore agreed, but allowed counsel only limited time to review the records.
 

 We conclude that in this case, the trial court did not err in its ruling any inability of current counsel to obtain the records was due primarily to Gore’s own actions in refusing his counsel access. Because Gore himself denied his counsel access to the records and is now complaining that counsel did not have enough time to review the records ultimately made available, this claim also highlights what can most aptly be characterized as an attempt to manipulate the system. Importantly, counsel, who eventually received the majority of the records, is unable to point to a single document contained in the formerly undisclosed record that might have been even marginally useful to the issues he sought to litigate in postconviction proceedings. Accordingly, we deny relief on this claim.
 

 D. Cumulative Error
 

 Gore also contends that the trial court erred in failing to conduct a cumulative analysis of the errors that rendered the result of his trial unreliable. However, because Gore’s individual claims of error are without merit, any cumulative error analysis would be futile. Therefore, we reject this claim of trial court error.
 
 See Williams v. State,
 
 987 So.2d 1, 14 (Fla.2008) (“Where allegations of individual error are without merit ... a cumulative error argument based thereupon must also fail.”).
 

 E. Whether the Trial Court Erred in Striking Gore’s Initial Postconviction Motion Without Leave to Amend
 

 In his next claim on appeal, Gore asserts that the trial court erred in striking his initial motion for postconviction relief without leave to amend. On June 18, 2002, Gore filed his initial motion for postconviction relief, which was stricken by the trial court as an improper pleading based on rule 3.851. Gore appealed the trial court’s ruling, which was treated by this Court as a motion for extension of time. In a March 10, 2003, order entered by this Court, Gore was granted an extension of time in which to file a proper motion pursuant to rule 3.851. Gore now appeals the trial court’s initial ruling, stating that the arbitrary application of rule 3.851 violates his due process and equal protection rights and that the trial court’s refusal to grant him leave to amend his motion has jeopardized his federal reme
 
 *16
 
 dies.
 
 [19]
 
 Further, Gore argues that he was merely relying on the advice of counsel in filing the improper motion.
 

 To the extent that Gore is alleging that rule 3.851 is unconstitutional as applied to him, this claim is without merit.
 
 See Gonzalez v. State,
 
 990 So.2d 1017, 1034 (Fla.2008) (“[R]ule 3.851 as amended in 2001 does not violate a defendant’s due process rights or equal protection rights.”). Moreover, we find that Gore’s claim that he authorized the filing of the improper motion based on the advice of counsel is in effect a claim of ineffective assistance of postconviction counsel, and thus is also without merit.
 
 See Waterhouse,
 
 792 So.2d at 1193 (reaffirming the conclusion that ineffective assistance of postconviction counsel is not a cognizable claim for relief).
 

 Finally, although the trial court did not err in striking Gore’s motion without leave to amend, we conclude that because this Court granted an extension of time pursuant to rule 3.851(d)(5) in which to file an amended motion, Gore’s amended motion in this case relates back to the date of the initial motion filed on June 18, 2002.
 
 See generally Bryant v. State,
 
 901 So.2d 810, 818 (Fla.2005) (noting that when an initial motion is stricken with leave to amend, a subsequent amended motion relates back to the date of the original filing). Accordingly, although the trial court did not err in its ruling, in our view this Court’s order granting an extension of time in which to file an amended motion rendered Gore’s motion timely for purposes of federal review.
 

 F. Remaining Claims of Trial Court Error
 

 We affirm the trial court’s ruling on Gore’s remaining claims without further discussion: the trial court’s summary denial of several of Gore’s postconviction claims because Gore’s claims are either procedurally barred, conclusively refuted by the record, or facially or legally insufficient; the court’s rejection of Gore’s
 
 Ring
 
 claim because we have repeatedly held that
 
 Ring
 
 is not retroactive,
 
 see Overton v. State,
 
 976 So.2d 536, 567 (Fla.2007); and the court’s denial of Gore’s claim that he is insane and cannot be executed because we have held such claims to be premature in the absence of an active death warrant.
 
 See Jones v. State,
 
 845 So.2d 55, 74 (Fla.2003).
 

 III. CONCLUSION
 

 Based on our examination of the issues raised by Gore on appeal, we affirm the trial court’s denial of Gore’s motion for postconviction relief.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur.
 

 PERRY, J., did not participate.
 

 [1]
 

 . Gore's first conviction was reversed and his case remanded for a new trial because of improper questions and comments by the prosecutor during the cross-examination of
 
 *3
 
 Gore and during closing argument.
 
 Gore v. State,
 
 719 So.2d 1197, 1202-03 (Fla.1998).
 

 [2]
 

 2. Counsel was subsequently reappointed for the
 
 Spencer
 
 hearing.
 
 See Spencer v. State,
 
 615 So.2d 688 (Fla.1993) (allowing for a hearing at which the trial judge may be presented with additional evidence).
 

 [3]
 

 3. The trial court found the following aggravating factors:
 

 (1) Gore was previously convicted of another capital felony involving the use or threat of violence to the person; (2) the capital felony was committed while Gore was engaged in the commission of, or an attempt to commit, or in flight after committing or attempting to commit any robbery; and (3) the capital felony was committed in a cold, calculated and premeditated manner without any pretense of legal justification ("CCP”).
 

 Gore,
 
 784 So.2d at 426 (footnote omitted). As to mitigation, the court found no statutory mitigation but found the following nonstatuto-ry mitigating factors: "(1) Gore suffered hearing loss (minimal weight); (2) Gore suffered from migraine headaches (minimal weight); and (3) Gore had previously stopped an altercation between Raul and Marisol Coto (minimal weight).”
 
 Id.
 

 [4]
 

 .Gore argued the following points:
 

 (1) the Double Jeopardy Clause of the United States and Florida Constitutions prevented the State from retrying Gore for first-degree murder and armed robbery; (2) the
 
 *5
 
 trial court erred in denying his motion for a mistrial following the State's questioning of Jessie Casanova about whether she had an “intimate relationship” with Gore; (3) the trial court erred in denying Gore’s motion for a judgment of acquittal on charges of first-degree murder and armed robbery; (4) the trial court abused its discretion in excluding reverse
 
 Williams
 
 rule evidence pertaining to the murder of Paulette Johnson, which allegedly supported Gore’s hypothesis of innocence; (5) the State introduced improper collateral crime evidence during the penalty phase; (6) the trial court erred in finding and weighing the CCP aggravating circumstance; (7) the trial court erred in permitting Gore to represent himself during the guilt phase closing argument and during the penalty phase of trial; and (8) Gore received ineffective assistance of counsel during the penalty phase.
 

 Id.
 
 at 426 n. 6.
 

 [5]
 

 .Gore alleged as follows: (1) he was denied his right to effective representation by the lack of time available to fully investigate and prepare his postconviction pleading and the unprecedented workload on counsel, in violation of his Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution and in violation of
 
 Spalding v. Dugger,
 
 526 So.2d 71 (Fla.1988); (2) his convictions are materially unreliable due to the cumulative effects of ineffective assistance of counsel, the withholding of exculpatory or impeaching material, newly discovered evidence, and/or improper rulings of the trial court in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights; (3) he was denied his rights under
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), at his trial when counsel failed to obtain an adequate mental health evaluation and failed to provide the necessary background information to the mental health consultant in violation of Gore’s equal protection and due process rights under the Fourteenth Amendment and his rights under the Fifth, Sixth and Eighth Amendments; (4) he was denied effective assistance of counsel at the penalty phase portion of his trial, including the
 
 Spencer
 
 hearing; (5) his execution would violate his Eighth Amendment rights because he is insane and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated because he was incompetent at the time of trial; (6) his sentencing jury was misled by comments, questions, and instructions that unconstitutionally and inaccurately diluted the jury's sense of responsibility towards sentencing in violation of the Eighth and Fourteenth Amendments and counsel was ineffective for not properly objecting; (7) he was denied his rights under the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and his rights under the Florida Constitution and was denied effective assistance of counsel in the postcon-viction proceedings because of rules prohibiting Gore's counsel from interviewing jurors to determine if constitutional error was present; (8) Florida’s capital sentencing procedures violate Gore’s Sixth Amendment right to have a unanimous jury return a verdict addressing his guilt of all the elements necessary for the crime of capital first-degree murder; (9) the application of the new rule 3.851 to Gore violates his due process and equal protection rights; and (10) his indictment was delayed by almost two years in violation of the Fourteenth Amendment.
 

 [6]
 

 .
 
 Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [7]
 

 . As to Gore's other claims concerning ineffective assistance of counsel at the penalty phase, the court stated: ”[T]he defendant having chosen to represent himself during the penalty phase before the jury cannot now claim ineffective assistance of counsel as to the evidence that was presented before the jury-”
 

 [8]
 

 . These issues are: (A) Gore was incompetent at the time of his trial and postconviction proceedings; (B) the trial court erred in finding that Gore waived his allegations of ineffective assistance of counsel during sentencing and the trial court erred in finding that Gore voluntarily waived an evidentiary hearing on his claim of ineffective assistance during the
 
 Spencer
 
 hearing; (C) the trial court erred in refusing to allow postconviction counsel complete and unfettered access to available public records or sufficient time for a full investigation into the records made available; (D) the trial court erred in failing to conduct a cumulative error analysis that fully considered Gore’s allegations of constitutional error; (E) the trial court erred in striking Gore’s initial postconviction motion without permitting him leave to amend; and (F) the trial court's summary denial of claims I, II, III, V, VI, IX and X was error; Florida’s capital sentencing procedures violate
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and Gore cannot be executed because he is insane. We have reordered the above issues from the brief in the order in which we will address them.
 

 [9]
 

 . Although postconviction relief was denied and that denial affirmed, Gore brought a successive postconviction motion pursuant to Florida Rule of Criminal Procedure 3.853 for DNA testing. That motion was summarily denied and is pending on appeal in this Court in Case No. SC07-678.
 

 [10]
 

 .The issue of whether Gore has intentionally manipulated the proceedings was the subject of an earlier case in which Gore was convicted of attempted murder, kidnapping, sexual battery, burglary, robbery, and theft.
 
 See Gore v. State,
 
 573 So.2d 87, 88 (Fla. 3d DCA 1991). There, Gore filed a motion to exclude electronic media from the courtroom. Several months prior to the trial, a psychologist diagnosed Gore with attention deficit disorder and a severe personality disorder and concluded that the presence of television cameras would distract Gore. After the psychologist’s testimony was presented at an eviden-tiary hearing, the court found Gore competent to testify and denied the motion. When Gore took the stand and stated he was "not going to be able to do this,” the court appointed three doctors to examine Gore and determine whether the presence of the cameras truly was affecting Gore’s ability to participate in the trial. Notably, the first psychiatrist that testified stated that "Gore did not suffer from any major illness, was manipulative, and was simply 'making an issue’ of the presence of the camera.”
 
 Id.
 
 The trial court ultimately denied the motion to exclude.
 
 Id.
 

 [11]
 

 . The record also indicates that the trial court appointed Dr. Haber on February 10, 1999, to examine Gore’s competency for the penalty phase.
 

 [12]
 

 . The trial court granted Gore's request to question Dr. Ruiz after the State and Gore's counsel completed their examinations.
 

 [13]
 

 . Gore's ineffective assistance claim also extends to counsel’s representation of Gore at the
 
 Spencer
 
 hearing, which we address later in this opinion.
 

 [14]
 

 . It appears that the State attempted to inform Gore and the court that the failure to present witnesses could result in a failure to meet the burden of proof and waiver of post-conviction claims. The State’s comment was cut off by the trial judge but Gore failed to ask for clarification. Instead, he reiterated his refusal to participate.
 

 [15]
 

 . As evidenced in his competency evaluation by Dr. Leland, Gore made similar demands in the Columbia County case, stating that he would not cooperate with sentencing phase issues, but would only assist with his "innocence claims.”
 

 [16]
 

 .Gore also argues that the court failed to hold a hearing pursuant to
 
 Nelson v. State,
 
 274 So.2d 256 (Fla. 4th DCA 1973), or
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and ignored evidence that Gore wished to proceed with substitute counsel. We reject Gore's claim of error concerning a
 
 Faretta
 
 inquiry because Gore failed to make an unequivocal request to represent himself and we conclude that in this case there was no reversible error as to Gore’s claim regarding the
 
 Nelson
 
 hearing.
 

 [17]
 

 . Gore's original postconviction counsel in the Columbia County case and in the instant case was attorney Raymond Glenn Arnold. However, based on Gore’s filing of complaints against Arnold, Arnold moved to withdraw from representing Gore in the Columbia County case on October 18, 2001, and the instant case on November 13, 2001. Tassone was subsequently appointed as counsel in the Columbia County case.
 

 [18]
 

 . It is not clear from the record whether the boxes of materials were solely from the Columbia County proceeding, solely from the instant case, or a mixture of the two. Regardless of which proceeding(s) the boxes were from, our analysis remains the same based on the facts of this case.
 

 [19]
 

 . According to 28 U.S.C. § 2244 (2006), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal petition for writ of habeas corpus must be filed within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.” 28 U.S.C. § 2244(d)(1)(A) (2006). However, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2) (2006).