# Supreme Court of Florida

_____

No. SC15-953
_____

**RENALDO DEVON MCGIRTH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-341
_____

**RENALDO DEVON MCGIRTH,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[January 26, 2017]

PER CURIAM.

Renaldo Devon McGirth appeals an order of the circuit court denying his

amended motion to vacate judgment of conviction and sentence of death filed

pursuant to Florida Rule of Criminal Procedure 3.851.  He further petitions this

Court for a writ of habeas corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9),

Fla. Const.  For the reasons that follow, we affirm the denial of postconviction

relief.  However, we grant the habeas petition and order that McGirth receive a

new penalty phase proceeding based on Hurst v. State (Hurst), 202 So. 3d 40 (Fla.

2016).

## FACTS AND PROCEDURAL BACKGROUND

### Trial and Direct Appeal Proceedings

McGirth was convicted of the 2006 first-degree murder of Diana Miller, the

attempted first-degree murder with a firearm of James Miller, robbery with a

firearm, and fleeing to elude a law enforcement officer operating a marked patrol

vehicle.  McGirth v. State, 48 So. 3d 777, 781-82 (Fla. 2010), cert. denied, 563

U.S. 940 (2011).  The jury recommended the death penalty for the murder of Diana

by a vote of eleven to one, and the trial court sentenced McGirth to death.  Id. at

784-85.  The facts of the crimes were described in the opinion on direct appeal:

> James and Diana Miller . . . lived in The Villages, a gated retirement
> community situated in Marion County, Florida.  Their daughter,
> Sheila Miller, who was in her late thirties at the time, was residing
> with them while she recovered from injuries sustained in an
> automobile accident that left her confined to a wheelchair. [n.1]
>
> > [N.1.]  Sheila's dependence on her parents had often
> > proven to be a source of contention between her parents
> > as her father opposed supporting her.  Sheila had battled
> > drug and alcohol abuse since her teenage years and had
> > been convicted of possession of cocaine and for uttering
> > false or worthless checks.  She had stolen from her

- 2 -

parents and at one point stole her mother's identity to obtain a credit card. Sheila's relationship with her parents deteriorated to the point that her father obtained an injunction against her.

McGirth, a prior acquaintance of Sheila, Jarrord Roberts, and Theodore Houston, Jr., visited Sheila at the Miller home on the afternoon of July 21, 2006. Sheila greeted McGirth with an embrace at the front door, after which the three men followed her inside the residence. . . . After some discussion, Sheila, McGirth, and Houston went into Sheila's bedroom, while Roberts remained in the living room with Diana. Once in the bedroom, McGirth pointed a small, silver gun in Sheila's direction . . . . Diana was then called into Sheila's bedroom where McGirth pushed her onto the bed. Sheila told Diana to give McGirth all of her money. Diana responded that she only had seventy dollars and explained that she did not keep that kind of money at the house. McGirth, in turn, insisted she had money because she lived in The Villages. After agreeing to get the money, Diana raised her hands in the air and was making her way toward the bedroom door to retrieve money when McGirth stood in front of the bedroom door and shot her once in the chest . . . . McGirth then instructed Houston to pick up the shell casing from the floor and wipe down any objects the men had touched to remove fingerprints. As she bled on Sheila's bed, Diana whispered to McGirth, "Please call 911; you just shot me in the heart." However, her pleas for help were ignored.

At some point, Roberts collected wallets and car keys . . . and handed them to McGirth. . . . James had just finished his shower when he was grabbed by the arm and dragged to Sheila's bedroom where he was forced to lie on the floor while one of the men pinned his head with a foot. After the men obtained the couple's credit cards and a personal identification number, Diana, still conscious, was taken to the computer room in an unsuccessful attempt to purchase cell phones online. A few minutes later Diana was able to crawl back into Sheila's bedroom.

McGirth and Houston removed Sheila from the home and Roberts placed her in the Millers' van. . . . McGirth and Houston returned to the home. Soon thereafter, as Houston was leaving the house with some items, McGirth shot James and Diana in the backs of their heads as they lay on the bedroom floor. James survived the

gunshot wound and was able to climb out of the bedroom window and summon the assistance of a neighbor.

McGirth, Roberts, and Sheila left in the Millers' van, while Houston followed in the silver Ford in which the men arrived. Following McGirth's orders, Sheila withdrew $500 from an automated teller machine (ATM) nearby and gave the money to McGirth, who subsequently divided the money into thirds. The four then drove to a K-Mart store in Belleview where McGirth and Sheila attempted to locate a particular type of cell phone. A few minutes later the men left the silver Ford in the K-Mart parking lot and took Sheila in the van to a mall . . . . At the mall, efforts to withdraw money from various ATMs and purchase items from stores failed.

At the Miller residence, law enforcement officers secured the scene and issued a BOLO ("be on the lookout") alert for a red van occupied by three black males and a possible kidnap victim. A police officer spotted the van at a convenience store in Ocala . . . . When McGirth . . . drove the vehicle out of the parking lot, the police officer activated his siren and lights which prompted McGirth to pull over . . . . When the officer ordered the driver to shut the van off, McGirth sped away. A high-speed chase in excess of 100 miles per hour ensued. As he drove the vehicle . . . McGirth handed the gun to Houston and ordered him to shoot Sheila because she could identify them. Houston, however, did not do so. The police ultimately used stop sticks to slow the van and then disabled it by employing the [Precision Immobilization Technique] maneuver, which caused the van to roll several times. . . . McGirth and Roberts were able to get out of the van and fled in opposite directions, but were apprehended and taken into custody shortly thereafter.

The police found bloody, folded money totaling $259 in McGirth's pocket, and his fingerprints were identified on two paper items from James's wallet.

Id. at 782-83 (some footnotes omitted).

In imposing a sentence of death, the trial court found the existence of five aggravating circumstances: (1) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification

- 4 -

(CCP) (great weight); (2) the murder was heinous, atrocious, or cruel (HAC) (great weight); (3) prior violent felony, based on the contemporaneous conviction for the attempted murder of James Miller (great weight); (4) the murder occurred during the commission of a robbery (great weight); and (5) the murder was committed primarily to avoid arrest (moderate weight). Id. at 784.

The court found McGirth's age (eighteen) to be a statutory mitigating circumstance and assigned it significant weight. Id. The court additionally found fifteen nonstatutory mitigating circumstances: (1) McGirth had a close bond with his siblings (very slight weight); (2) he grew up in a poor family (little weight); (3) he grew up in an abusive home (little weight); (4) neglect by his custodial parents (little weight); (5) substance abuse (very slight weight); (6) intermittent exposure to positive role models (some weight); (7) testimony that characterized McGirth as a follower and not a leader (no weight); (8) a diagnosis of conduct disorder (very little weight); (9) a diagnosis of antisocial personality disorder (very little weight); (10) exposure to people with criminal histories (some weight); (11) a strong religious background (little weight); (12) good courtroom conduct (slight weight); (13) significant family losses (little weight); (14) he can benefit from a structured environment (slight weight); and (15) he was deprived of a relationship with his biological father (some weight). Id. at 785. The trial court found that McGirth's IQ score of 98 was not a mitigating factor, and it also rejected the

proposed nonstatutory mitigating factor that he acted under the influence and domination of another. Id. at 785 n.6. Additionally, while the trial court did not find that letters requesting mercy for McGirth were a nonstatutory mitigating factor, it stated that even if a request for mercy constituted nonstatutory mitigation, only "very slight weight" would be given. Id.

On direct appeal, McGirth raised eight issues: (1) whether the trial court erred in admitting Williams[1] rule evidence during the guilt phase; (2) whether the trial court erred in its response to a jury question concerning the law on principals; (3) whether the trial court erred in admitting victim impact evidence during the penalty phase; (4) whether a prosecutorial remark during closing statements warranted a new penalty phase; (5) whether the trial court erred in finding the CCP aggravator; (6) whether the trial court erred in finding the HAC aggravator; (7) whether the trial court erred in finding the avoid arrest aggravator; and (8) whether Florida's death penalty scheme violates Ring v. Arizona, 536 U.S. 584 (2002), and related cases. 48 So. 3d at 785. This Court rejected all claims and affirmed McGirth's convictions and sentences. Id. at 797.

---

1. Williams v. State, 110 So. 2d 654 (Fla. 1959).

## Postconviction Proceedings

In 2012, McGirth through Capital Collateral Regional Counsel-Middle Region (CCRC-M) filed a Motion to Vacate Judgment of Conviction and Sentence, raising nine claims, some with multiple subparts. The claims, in brief,[2] were: (1) the State committed Brady and Giglio violations;[3] (2) newly discovered evidence; (3) ineffective assistance of counsel during the guilt phase; (4) ineffective assistance of counsel during the penalty phase; (5) cumulative error; (6) a Caldwell violation occurred;[4] (7) McGirth may be incompetent at the time of execution; (8) Florida's capital sentencing statute violates Ring and Apprendi v. New Jersey, 530 U.S. 466 (2000); and (9) Florida's capital sentencing statute fails to prevent arbitrary and capricious imposition of the death penalty, and lethal injection constitutes cruel and unusual punishment. McGirth sought an evidentiary hearing on claims (1) through (4). In its response to the motion, the State conceded that an evidentiary hearing was required on these claims.

---

2. McGirth ultimately chose to represent himself and waived an evidentiary hearing on the claims for which a hearing had been granted. Because the claims raised in the motion are not before the Court, we do not discuss them except where relevant to our analysis.

3. Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972).

4. Caldwell v. Mississippi, 472 U.S. 320 (1985).

At the September 23, 2013, evidentiary hearing, McGirth expressed that he and CCRC-M counsel were experiencing conflict. McGirth asked that CCRC-M be discharged, and that the postconviction court either appoint new counsel or permit him to represent himself. The postconviction court conducted a Nelson[5] inquiry and concluded that CCRC-M was not providing ineffective assistance. The court then stated that if McGirth still wanted to discharge counsel, it would treat his request as an exercise of the right to self-representation. McGirth confirmed that he wished to represent himself. Thereafter, the court conducted a Faretta[6] inquiry and concluded that McGirth was competent to make the decision to represent himself, and that his decision was knowing and voluntary.[7] CCRC-M was ultimately appointed as standby counsel.[8]

---

5. Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973).

6. Faretta v. California, 422 U.S. 806 (1975).

7. In 2014, Florida Rule of Criminal Procedure 3.851 was amended to preclude capital defendants from representing themselves in postconviction proceedings. See In re Amends. to Fla. Rules of Jud. Admin.; Fla. Rules of Crim. P.; and Fla. Rules of App. P.—Capital Postconviction Rules, 148 So. 3d 1171, 1180-81 (Fla. 2014). The rule as amended applies to postconviction motions filed on or after January 1, 2015, and "[m]otions pending on that date are governed by the version of this rule in effect immediately prior to that date." Id. at 1180. Because McGirth filed his postconviction motion in 2012, this amendment did not impact his ability to represent himself.

8. Capital Collateral Regional Counsel-Southern Region (CCRC-S) was initially appointed as standby counsel. However, it filed a motion for reconsideration, noting that the postconviction court found no actual conflict between McGirth and CCRC-M, and no ineffective representation by CCRC-M.

On the day the evidentiary hearing was due to commence, CCRC-M filed a Motion to Determine Competency. CCRC-M contended that McGirth was exhibiting behavior and symptoms that called his competency into question. The postconviction court appointed Dr. Gregory Prichard and Dr. Robert Berland to evaluate McGirth. During the competency hearing, McGirth expressed the desire to represent himself, and the court conducted another Faretta inquiry. The court concluded that McGirth knowingly and voluntarily waived his right to counsel during the competency hearing and permitted McGirth to represent himself with the assistance of standby counsel. The court subsequently found McGirth competent to proceed, and the evidentiary hearing was rescheduled to commence on February 16, 2015.

McGirth filed pro se motions that amended claims (1) and (3) and added claim (10), which contended that the State engaged in a discriminatory prosecution based upon the fact that the three codefendants were African-American, and Sheila

---

CCRC-M also filed a "Motion and Memorandum of Law Regarding Appointment of Standby Counsel," stating that "[a]s a result of . . . discussions with Mr. McGirth, and with the agreement of Mr. McGirth, counsel for CCRC-M is prepared to act as standby counsel for Mr. McGirth." CCRC-M contended that it was in the best posture to serve because "[a]ny other counsel would have to start essentially from ground zero. The sheer bulk of materials in this case, exceeding well over 30,000 pages, would be burdensome on any counsel not already familiar with the materials." The postconviction court granted the motion for reconsideration and reappointed CCRC-M as standby counsel.

Miller was Caucasian. McGirth further asserted that trial counsel was ineffective for failing to raise a claim pursuant to McCleskey v. Kemp, 481 U.S. 279 (1987).[9] On February 5, 2015, McGirth filed a motion for continuance of the evidentiary hearing. On February 9, 2015, he filed a Composite Motion to Appoint Conflict Free Co-Counsel or Conflict Free Counsel, and also a Motion to Stay the Transport of Witnesses.

During a February 13, 2015, hearing, the court held that the motion to transport was moot because the witnesses named in the motion had already been brought to Marion County, and denied the motion for continuance and the composite motion. Once these rulings were announced, McGirth submitted a motion to disqualify. The court orally denied the motion as insufficient and untimely, and later issued an order to that effect.

---

9. This Court has described the McCleskey decision as follows:

> [I]n McCleskey v. Kemp, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987), the Supreme Court held that studies showing disproportionate impact of death sentences on black defendants as compared to white defendants were not sufficient to find the state's administration of the death penalty violated a black defendant's right to equal protection. However, the Court went on to say, "[T]o prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in his case acted with discriminatory purpose." Id. at 292.

Freeman v. State, 761 So. 2d 1055, 1068 (Fla. 2000) (alteration in original).

At the February 16, 2015, evidentiary hearing, McGirth announced that he would waive the presentation of evidence and instead "preserve the right to appeal all rulings up to this point." On April 14, 2015, the postconviction court entered an order that denied McGirth's amended rule 3.851 motion. The order addressed the claims for which an evidentiary hearing had been granted and concluded that, due to McGirth's failure to offer any evidence, the burden of proof had not been met.

This appeal follows. On February 24, 2016, McGirth filed a petition for writ of habeas corpus with this Court.

## ANALYSIS

### Sufficiency of the Nelson Inquiry

McGirth first contends that the Nelson inquiry conducted by the postconviction court was insufficient. Based upon our thorough review of the record, we disagree. In Nelson, the Fourth District Court of Appeal articulated a procedure to be followed when a defendant seeks to discharge court-appointed counsel based upon incompetence:

> [T]he trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his

- 11 -

original counsel the State may not thereafter be required to appoint a substitute.

274 So. 2d at 259. We adopted this procedure in Hardwick v. State, 521 So. 2d 1071, 1074 (Fla. 1988). However, we have explained that where a defendant seeks to discharge counsel based upon a difference of trial strategy, and not incompetency, a Nelson inquiry is not required. See McKenzie v. State, 29 So. 3d 272, 282 (Fla. 2010). Based upon the applicable law, our analysis is two-pronged. First, we must determine whether McGirth alleged that CCRC-M was ineffective, thereby triggering a Nelson inquiry. Second, if we conclude that McGirth did allege ineffectiveness as a basis for seeking the discharge of CCRC-M, we must next determine whether the inquiry conducted by the postconviction court was sufficient.

With regard to the first prong, we conclude that McGirth did challenge the effectiveness of his counsel. McGirth clearly expressed to the postconviction court that he felt CCRC-M was raising frivolous issues and refusing to present what McGirth felt were meritorious issues. McGirth expressed frustration that CCRC-M had not presented a McCleskey claim based upon Brady evidence that allegedly would have shown Sheila Miller was a perpetrator of the crimes, and not a victim. He believed that counsel was focusing too much on mental health issues, opining that eighty percent of CCRC-M's time was spent exploring mental health, and only

twenty percent was dedicated to guilt phase issues.  He felt that, with regard to any mental health claims, it was going to be a "standoff" between experts.

There are admittedly comments by McGirth that appear to be a difference of opinion as to strategy.  For example, McGirth stated that while he recognized the accomplishments of the CCRC-M attorney, this did not mean that the attorney was the "best fit" for him.  This comment is very similar to the statement made by the defendant in McKenzie in seeking to discharge counsel:

> I don't think they're incompetent.  I mean, they passed the Bar exam, okay?  That in itself is an accomplishment.  I don't think I could pass the Bar exam. . . .  Do I think they're incompetent?  No, I don't.  But do I think that they have my best interest . . . at hand?  No, I don't.  I think they have their own best interest at hand.

29 So. 3d at 282.  However, whereas the defendant's primary complaint in McKenzie was that counsel waived his right to speedy trial without first consulting him—something counsel could do under the law—McGirth's expressed reasons for seeking the discharge of CCRC-M are more akin to a claim of ineffectiveness.  These reasons were: (1) CCRC-M insisted on pursuing claims that McGirth believed had no chance of success, and focusing on mental health issues; and (2) CCRC-M was not presenting claims that McGirth felt were meritorious.  Further, McGirth believed that he would be prejudiced by CCRC-M's failure to present claims that he thought had merit:

> [If CCRC-M] come[s] in with these frivolous motions and you deny me, and then I try to come back later and say hey, I want to raise this,

[the attorneys for the State] or whoever, they gonna say well, why didn't you raise that in post-conviction and [CCRC-M will] be somewhere else representing somebody else . . . and I'll be sitting on death row stuck because, all because I couldn't get the issues in the motion because me and [my] attorney was at a clash on how to best represent me.

We conclude that McGirth's dissatisfaction constituted a challenge to CCRC-M's effectiveness, thereby triggering a Nelson inquiry.

As to the second prong, we conclude that the Nelson inquiry was sufficient. The postconviction court allowed McGirth a full opportunity to explain why he believed counsel was not representing him properly. When McGirth declined to name specific witnesses who CCRC-M was planning to present that he disagreed with, the court stated, "I want to give you every chance to tell me how you think they're being ineffective. I don't want to cut you off if you want to tell me." The court also gave CCRC-M the opportunity to respond to McGirth's complaints. The attorney from CCRC-M stated that (1) he had planned to present one of the claims desired by McGirth in a habeas petition if the motion for postconviction relief was denied, but he could incorporate it into closing statements if permitted by the court; and (2) he had not heard about the McCleskey issue until the morning of the hearing, but it was consistent with the Brady claim that had already been raised in

- 14 -

the postconviction motion; i.e., the State had failed to disclose evidence that indicated Sheila Miller was actually a perpetrator, and not a victim.[10]

Lastly, the court noted that it had reviewed the postconviction motion filed by CCRC-M. That motion presented claims such as: (1) the State failed to disclose to the defense a witness who believed Sheila was involved in the crimes against her parents, and would have testified that Sheila did not seem to care about her parents and spoke about them having money; (2) newly discovered evidence that while in jail, Sheila stated that she had her mother killed; (3) trial counsel was ineffective during the guilt phase for failing to object to the introduction of prejudicial photographs; and (4) trial counsel was ineffective during the penalty phase for failing to present a detective who would have testified that Sheila was concerned the codefendants would implicate her, and for failing to conduct an

---

10. McGirth is correct that CCRC-M failed to mention at the hearing that Sheila, during an emergency room interview on the day of the offenses, allegedly stated she shot her mother. This statement purportedly was made in front of a detective, the detective's supervisor, and an assistant state attorney. Further, according to McGirth, a detective who was investigating the crimes against the Millers was allegedly ordered by a supervisor to stop pursuing Sheila as a possible suspect. However, the postconviction court cannot be faulted for failing to inquire deeper into this claim where nothing discussed during the hearing indicated its existence. "[A] trial judge's inquiry into a defendant's complaints of incompetence of counsel can be only as specific and meaningful as the defendant's complaint." Lowe v. State, 650 So. 2d 969, 975 (Fla. 1994). We note that McGirth was allowed to amend his postconviction motion to add both this claim and the McCleskey claim.

adequate investigation into mitigating evidence. With regard to the latter, the motion included allegations such as: (1) McGirth suffers from a seizure disorder that was first recognized while he was an infant; (2) he suffered multiple head injuries for which he never sought treatment; and (3) he was beaten regularly by his aunt, who was forced to care for him while his mother was incarcerated.[11]

Based upon the foregoing, we conclude that the postconviction court conducted a sufficient Nelson inquiry before it determined that CCRC-M was not providing ineffective assistance to McGirth. Accordingly, we reject this claim as without merit.

**Adequacy of the Faretta Inquiry**

McGirth next contends that the Faretta inquiry conducted by the postconviction court during the September 23 hearing was inadequate. The applicable law with regard to a defendant who seeks to exercise his right to self-representation is as follows:

> It is well settled that the accused has the right to self-representation. Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). However, it is also settled that the defendant must unequivocally elect to represent himself. State v. Craft, 685 So. 2d 1292, 1295 (Fla. 1996). Further, after the defendant elects to represent himself, the court must conduct a colloquy to ensure the accused is making a knowing waiver. Hardwick v. State, 521 So. 2d 1071, 1074 (Fla. 1988). This Court approved a standard colloquy for

---

11. This description does not encompass all claims raised, but is only intended to demonstrate the comprehensiveness of the motion.

- 16 -

a trial court to employ in <u>Amendment to Fla. Rules of Crim. Pro. 3.111(d)(2)-(3)</u>, 719 So. 2d 873 ([Fla. ]1998). The standard <u>Faretta</u> inquiry requires the judge to explicitly state the pitfalls of self-representation. The colloquy also requires the judge to state that the defendant's access to legal resources will be limited while in custody and that the defendant is not required to possess special skills in order to represent himself. <u>Amendment</u>, 719 So. 2d at 877.

However, a trial judge is not required to follow the colloquy word for word. <u>See</u> <u>Smith v. State</u>, 956 So. 2d 1288, 1290 (Fla. 4th DCA 2007). Rather, the essence of the colloquy is to ensure the defendant makes a knowing and voluntary waiver of counsel. <u>See</u> <u>Porter v. State</u>, 788 So. 2d 917, 927 (Fla. 2001). In order to ensure the waiver is knowing and voluntary, the trial court must inquire as to the defendant's age, experience, and understanding of the rules of criminal procedure. <u>Id.</u> When reviewing a trial court's handling of a request for self-representation, the standard of review is abuse of discretion. <u>Holland v. State</u>, 773 So. 2d 1065, 1069 (Fla. 2000).

<u>Aguirre-Jarquin v. State</u>, 9 So. 3d 593, 602 (Fla. 2009).

We conclude that the <u>Faretta</u> inquiry here was completely adequate. After McGirth unequivocally articulated his desire to represent himself, the court thoroughly discussed the advantages of representation and the pitfalls of proceeding pro se. The postconviction court warned McGirth that "it's almost always unwise to represent yourself in court," and discussed the disadvantages of self-representation. These included that (1) McGirth would not receive special treatment by the court or the State; (2) he would not be entitled to additional prison library privileges; (3) he would be expected to abide by the law and the rules of procedure; and (4) if he is unsuccessful in his postconviction proceedings, he will

not be able to raise his lack of knowledge or skill as a basis for relief on appeal.

The court described the benefits of representation by counsel as follows:

> [T]hey could obviously call witnesses for you, question witnesses against you, present evidence on your behalf, can advise you about whether to testify or not testify, they know the rules of evidence, know what evidence can and cannot come in.  And they can also preserve any errors that they believe that I may commit during this hearing so that . . . the Florida Supreme Court can properly review that.

The court stated for the record McGirth's age, education, and IQ score; confirmed that McGirth could read and write; verified that McGirth was not under the influence of drugs, alcohol, or medications; indicated that McGirth followed along during his trial and was not disruptive; and even noted during the Nelson inquiry that McGirth was "clearly conversant with things and talking about McCleskey and . . . a recent case that I dealt with in a different setting a few weeks ago, but I mean, he's on the cutting edge of new US Supreme Court cases, for lack of a better term."  Both the State and the court inquired as to any mental health issues which might impede McGirth's ability to represent himself, and McGirth denied that he was experiencing symptoms or that he was on any medication other than ibuprofen.  When McGirth misunderstood the limited role of standby counsel, the court clarified that role and reiterated that the limited assistance McGirth would receive from standby counsel was one of the disadvantages of self-representation.

Based upon the foregoing, the postconviction court did not abuse its discretion when it concluded that McGirth was making a knowing and voluntary waiver of counsel and allowed McGirth to represent himself during the postconviction proceedings. We reject this claim.

**CCRC-M as Standby Counsel**

McGirth asserts that the postconviction court erred when it reappointed CCRC-M as standby counsel. As part of this claim, he notes that CCRC-M failed to provide him with copies of all of the records from his case within the time ordered by the postconviction court. He also appears to assert that CCRC-M interfered with his right to self-representation by filing the motion for determination of competency. With regard to standby counsel, we have explained:

> [T]he appointment of standby counsel under Faretta is constitutionally permissible; it is not constitutionally required. Goode v. State, 365 So. 2d 381 (Fla. 1978), cert. denied, 441 U.S. 967, 99 S. Ct. 2419, 60 L. Ed. 2d 1074 (1979). Faretta recognizes that the trial court may, over a defendant's objection, "appoint 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." 422 U.S. at 835 n.46, 95 S. Ct. at 2541 n.46.

Jones v. State, 449 So. 2d 253, 258 (Fla. 1984). Therefore, although McGirth requested legal assistance, the postconviction court was not constitutionally required to appoint standby counsel. It nonetheless elected to do so. As previously discussed, the court initially appointed CCRC-S as standby counsel. However, the

- 19 -

State, CCRC-S, and CCRC-M all filed pleadings asserting that there was no conflict between CCRC-M and McGirth, and CCRC-M was the entity best suited to serve as standby counsel. CCRC-M's motion specifically noted that McGirth agreed to the reappointment of CCRC-M. Given that the court had previously found no conflict between CCRC-M and McGirth, and the fact that CCRC-M was the entity most familiar with McGirth's case, we conclude that the reappointment of CCRC-M as standby counsel did not constitute an abuse of discretion.

McGirth's further complaints are without merit, in that the actions of CCRC-M did not interfere with his right to self-representation. In its pleading seeking reappointment as standby counsel, CCRC-M acknowledged that preparation of the record materials had taken substantially longer than anticipated. However, nothing in the record indicates that CCRC-M was derelict in its obligation to provide McGirth with the materials so that he could represent himself. Rather, the reason CCRC-M had difficulty complying with the two-week deadline imposed by the postconviction court was the sheer volume of the materials to be produced (well over 30,000 pages, according to CCRC-M). Further, there is no indication that McGirth was prejudiced by CCRC-M's failure to produce the materials within the time period initially ordered by the court because he received extensions of time to file his amended rule 3.851 motion.

With regard to McGirth's assertion that CCRC-M interfered with his right to self-representation by filing a motion to determine competency, we have stated that the role of standby counsel is to assist a court in conducting orderly and timely proceedings. Behr v. Bell, 665 So. 2d 1055, 1056 (Fla. 1996). Logically speaking, if standby counsel has a good-faith concern that a pro se defendant is incompetent to continue with self-representation, counsel should be able to present that concern to the court. We conclude that allowing standby counsel to make such a request, when it is in good faith, would facilitate orderly and timely court proceedings because it would help to prevent a potentially incompetent defendant from representing himself and then challenging his competency on appeal.

As previously noted, CCRC-M filed a pleading suggesting that McGirth was exhibiting behavior and symptoms that called his competency into question. These included increasingly unfocused, distant, and detached attention; odd thinking and inappropriate attention to detail; increasingly severe headaches; bizarre behavior during legal consultations, such as head bobbing; and abruptly jumping from one line of discussion to another. CCRC-M stated that it had a "good faith basis to believe there are reasonable grounds to question Mr. McGirth's present competence to proceed or to represent himself."[12] During the hearing at which

---

12. This language tracks Florida Rule of Criminal Procedure 3.851(g)(2) with regard to when collateral counsel may request a competency determination: "Collateral counsel may file a motion for competency determination and an

- 21 -

CCRC-M's motion was discussed, the State agreed to a determination in an abundance of caution:

> The safest course of conduct, of course would be, appoint the experts, put off the [evidentiary] hearing, have them examine him, reset the hearing for a later time. The risk of not doing it, obvious to all of us, it goes to the Supreme Court, they say you should have done it, send it back and we do it all over again.
>
> If the Court chooses caution, I certainly am not going to object to that. In part, I would almost suggest caution in this case as opposed to going forward.

Based upon the allegations presented in the motion, and the State's agreement to a determination, we conclude that the postconviction court's decision to have McGirth evaluated for competency did not interfere with his right to self-representation.

Accordingly, McGirth is not entitled to relief on this claim.

### Self-Representation at the Competency Hearing

McGirth next contends that the postconviction court erred when it permitted him to represent himself during the competency hearing. He further asserts that the competency hearing was insufficient. We address each argument in turn.

In determining whether a defendant is competent to proceed, a court must consider whether he "has sufficient present ability to consult with counsel with a

---

accompanying certificate of counsel that the motion is made in good faith and on reasonable grounds to believe that the death-sentenced defendant is incompetent to proceed."

reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the pending collateral proceedings." Hernandez-Alberto v. State, 126 So. 3d 193, 204 (Fla. 2013) (quoting Hardy v. State, 716 So. 2d 761, 763 (Fla. 1998)); see also Fla. R. Crim. P. 3.851(g)(8)(A). The United States Supreme Court in Godinez v. Moran, 509 U.S. 389, 399-401 (1993), concluded that the competence required to stand trial, plead guilty, and waive the right to counsel is the same, although the waiver of a constitutional right must also be knowing and voluntary. We have explained the standard for review of a competency determination as follows:

> "It is the duty of the trial court to determine what weight should be given to conflicting testimony." Alston v. State, 894 So. 2d [46,] 54 [(Fla. 2004)] (quoting Mason v. State, 597 So. 2d 776, 779 (Fla. 1992)). "The reports of experts are 'merely advisory to the [trial court], which itself retains the responsibility of the decision.' " Id. (quoting Hunter v. State, 660 So. 2d 244, 247 (Fla. 1995)). Thus, when the experts' reports or testimony conflict regarding competency to proceed, it is the trial court's responsibility to consider all the relevant evidence and resolve such factual disputes. Id.; see also Hardy, 716 So. 2d at 764.
> "Where there is sufficient evidence to support the conclusion of the lower court, [this Court] may not substitute [its] judgment for that of the trial judge." Alston, 894 So. 2d at 54 (quoting Mason, 597 So. 2d at 779). A trial court's decision regarding competency will stand absent a showing of abuse of discretion. Id.; see also Hardy, 716 So. 2d at 764; Carter v. State, 576 So. 2d 1291, 1292 (Fla. 1989). . . . A trial court's decision does not constitute an abuse of discretion "unless no reasonable person would take the view adopted by the trial court." Alston, 894 So. 2d at 54 (quoting Scott v. State, 717 So. 2d 908, 911 (Fla. 1998)).

Hernandez-Alberto, 126 So. 3d at 204-05 (some alterations in original).

We have held that a capital defendant may waive the right to counsel and represent himself during a competency hearing where no reasonable doubt has been raised as to his mental competence. See Larkin v. State, 147 So. 3d 452, 464 (Fla. 2014). The determination that a defendant is competent to represent himself at a competency hearing is reviewed for abuse of discretion. See id. McGirth attempts to factually distinguish Larkin on the basis that Larkin was thirty-eight years old at the time of the proceeding, had attended college for two years, and grew up in a comfortable home with an intact family, whereas McGirth grew up in relative poverty, attained a high school diploma while in jail, had allegedly suffered head injuries, and had been diagnosed with a psychotic disturbance. McGirth also contends that he repeatedly requested new counsel, whereas the defendant in Larkin did not.

Neither of these distinctions warrants a conclusion that the postconviction court abused its discretion when it allowed McGirth to represent himself during the competency proceeding. First, regardless of McGirth's background, the record demonstrates that he understood legal concepts and could articulate his position clearly. Second, the postconviction court had previously found that CCRC-M was not providing deficient representation. Therefore, although McGirth may have requested substitute counsel, he did not have a right to the appointment of alternate counsel. See Weaver v. State, 894 So. 2d 178, 188 (Fla. 2004) ("[I]f a trial court

decides that court-appointed counsel is providing adequate representation, the court does not violate an indigent defendant's Sixth Amendment rights if it requires him to keep the original court-appointed lawyer or represent himself."). Therefore, Larkin is applicable to McGirth.

We conclude that, despite the allegations presented in CCRC-M's motion for a competency determination, no reasonable doubt as to McGirth's competence had been demonstrated to the postconviction court. During the hearing on whether to have McGirth evaluated for competency, the court noted that it had not seen anything over the years that called into question McGirth's competency.[13] In fact, in the order appointing the experts, the court expressly stated it was granting a competency determination only in an abundance of caution. Further, at the beginning of the competency hearing, the postconviction court specifically stated that it had read the evaluations prepared by Dr. Prichard and Dr. Berland. We have similarly reviewed these evaluations, which are part of the record on appeal but are sealed and confidential. Our review of the evaluations, as well as the entire postconviction record, leads us to conclude that a reasonable doubt as to McGirth's competency had not been established. Accordingly, the court did not abuse its

---

13. The same judge presided over both McGirth's capital trial and the postconviction proceedings.

discretion when it permitted McGirth to represent himself during the competency hearing after it conducted a second full <u>Faretta</u> inquiry.[14]

McGirth next contends that the competency hearing was insufficient. We disagree. During the hearing, two experts testified on direct examination and cross-examination as to their conclusions with regard to McGirth's competency, and the parties were permitted to make closing statements to the court. In determining that McGirth was competent, the court did not rely exclusively upon the expert reports:

> I was the judge that presided over Mr. McGirth's trial . . . and so I've had a chance to see Mr. McGirth over the years, as well as these proceedings. I know we do have conflicting testimony from the doctors regarding the competency of Mr. McGirth . . . . That being said, it's my job to determine what weight is to be given to the conflicting testimony because at the end of the day, it's my decision.
> And, you know, I've also had a chance to read Mr. McGirth's various pro se motions throughout the post-conviction proceedings.

---

14. McGirth relies upon two cases in which federal courts held that where a defendant's competence is reasonably in question, a court may not allow that defendant to waive the right to counsel and proceed pro se until resolution of the issue of competency. See <u>United States v. Klat</u>, 156 F.3d 1258, 1263 (D.C. Cir. 1998); <u>United States v. Purnett</u>, 910 F.2d 51, 56 (11th Cir. 1990). However, in <u>Klat</u>, the trial court made an express finding that there was "reasonable cause" to believe the defendant was incompetent to stand trial. 156 F.3d at 1262. In <u>Purnett</u>, the trial court sua sponte questioned the defendant's competency because it believed the defendant had acted in an inappropriate manner. 910 F.2d at 53. Because the court here saw nothing to indicate that McGirth was incompetent to proceed, these cases are distinguishable.

In the order adjudicating McGirth competent to proceed, the court reaffirmed that it had "never observed any behavior of the Defendant suggestive of incompetence." Based upon the expert evaluations, the pleadings filed and the arguments made by McGirth during the postconviction proceedings, and the court's own observations over the years, we conclude that the court did not abuse its discretion when it determined that McGirth was competent to proceed.

Based upon the foregoing, this claim is without merit.

### Motion to Disqualify

McGirth contends that the postconviction court improperly denied the motion to disqualify because during the proceedings, the court allegedly exhibited a pattern of preferential treatment to the State and punitive treatment of McGirth for choosing to represent himself. We have explained:

> A motion to disqualify a judge "must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy." Rivera v. State, 717 So. 2d 477, 480-81 (Fla. 1998) (quoting Jackson v. State, 599 So. 2d 103, 107 (Fla. 1992)). The judge should grant a motion to disqualify if "it shows that the party making the motion has a well-grounded fear that he or she will not receive a fair trial from the presiding judge." Barwick v. State, 660 So. 2d 685, 691 (Fla. 1995). However, the fact that a judge has ruled adversely to the party in the past does not constitute a legally sufficient ground for a motion to disqualify.

Thompson v. State, 759 So. 2d 650, 659 (Fla. 2000). Having reviewed the entire record in this case, there is nothing to indicate that the postconviction court was prejudiced or biased against McGirth. Contrary to McGirth's assertions, the court

was courteous, fair, and accommodating throughout the proceedings. The court granted McGirth multiple extensions of time, appointed an investigator to assist him, and consistently honored McGirth's desire to represent himself after emphasizing during each <u>Faretta</u> inquiry that it was inadvisable for him to do so.

This claim is without merit.

**Waiver of the Evidentiary Hearing**

McGirth next asserts that his waiver of the evidentiary hearing was not valid. We disagree. A defendant can waive an evidentiary hearing on a claim provided that the waiver is knowing, intelligent, and voluntary. <u>See</u> <u>Gore v. State</u>, 24 So. 3d 1, 13-14 (Fla. 2009). At the beginning of the hearing, and after stating that he did not wish to be represented by CCRC-M, McGirth moved to waive the evidentiary hearing, but "preserve the right to appeal all rulings up to this point." The postconviction court conducted another detailed inquiry in which it first confirmed that McGirth understood he had the right to present evidence. The court then conducted a third <u>Faretta</u> inquiry, during which it articulated the advantages of counsel and the disadvantages of self-representation. The court further informed McGirth that he bears the burden at the postconviction stage to demonstrate the merits of his case, and "by waiving that, you're not putting on any evidence, so there's no evidence for me to rule in your favor on the evidentiary matters." The court also explained that if it found McGirth had knowingly and voluntarily

- 28 -

waived his right to proceed with the evidentiary hearing, it had "no choice, unless there's something in the record right now, other than to deny your notion [sic] on the evidentiary issues." McGirth stated that he understood the implications of his waiver.

With regard to competency, the court confirmed that McGirth was not under the influence of alcohol, drugs, or medication; he had no physical problems that would limit his self-representation; he had not been told not to use a lawyer; and he is able to read, write, and understand the English language. McGirth again confirmed that he did not want CCRC-M to represent him. The State noted:

> And so the record is clear and so Mr. McGirth understands, we've been trying to keep track this morning of the witnesses actually being here, and of the 21 that's listed on the notice of filing that they've been served, almost all of them are actually present outside of the courtroom ready and willing to testify. And that includes nearly all of the whole list as last we were taking roll.

The witnesses included McGirth's codefendants, as well as an individual who allegedly heard Sheila Miller state while in the Marion County jail, "I had my own momma killed." The State had agreed to pay the travel expenses of two experts who were scheduled to testify on the third day of the evidentiary hearing.

The State also confirmed that McGirth understood the implications of his waiver:

> STATE: [I]f you don't put on evidence, then there is no support in the record for those claims that you made; for instance about Brady, that evidence was hid or false evidence was used in your

trial.  Unless you put on evidence of that, there is nothing in the record that either Judge Lambert nor the appellate court can use to uphold those claims that you've made.

You understand that?

McGIRTH:  Yeah.

STATE:  Your Honor, I think with that I think Mr. McGirth clearly has the legal right and the Constitutional right to choose whether to present evidence or not.  The witnesses are here, they're ready to go forward.  If he chooses not to do that, I believe that's within his ability and his right.

McGirth confirmed that he understood he could present evidence <u>and</u> appeal any issues previously raised, but still chose to waive his right to an evidentiary hearing. When asked if he wished to provide a reason for the waiver, McGirth replied in the negative.  After the inquiry, the court concluded that McGirth was competent to waive his right to an evidentiary hearing, and that his waiver was freely and voluntarily made.

Based upon the colloquy conducted by the postconviction court, we conclude that McGirth was competent to waive his right to present evidence on those claims for which an evidentiary hearing had been granted, and his waiver was knowing, intelligent, and voluntary.  Both the court and the State ensured that McGirth understood the consequences of his waiver—that the court would be compelled to deny these claims as unproven, and this Court would be compelled to affirm the denial of those claims for lack of evidence.  Further, the court conducted a third full <u>Faretta</u> inquiry to ensure that McGirth did not wish to have the assistance of counsel in deciding whether to waive the evidentiary hearing.

In light of the foregoing, this claim is rejected.

**PETITION FOR WRIT OF HABEAS CORPUS**

McGirth presents three claims in his petition for writ of habeas corpus.

Because we conclude that the Hurst claim is dispositive, we decline to address the

others. In Hurst v. Florida, 136 S. Ct. 616, 621 (2016), the United States Supreme

Court held that Florida's capital sentencing scheme violated the Sixth Amendment.

The Supreme Court concluded that "[t]he Sixth Amendment requires a jury, not a

judge, to find each fact necessary to impose a sentence of death. A jury's mere

recommendation is not enough." Id. at 619.

On remand from the Supreme Court, we held that "in addition to

unanimously finding the existence of any aggravating factor, the jury must also

unanimously find that the aggravating factors are sufficient for the imposition of

death and unanimously find that the aggravating factors outweigh the mitigation

before a sentence of death may be considered by the judge." Hurst, 202 So. 3d at

54. We further held that a unanimous jury recommendation is required before a

trial court may impose a sentence of death. Id. Finally, we determined that the

error defined in Hurst is capable of harmless error review. Id. at 67.[15]

_____

15. We rejected Hurst's contention that in light of Hurst v. Florida, section 775.082(2), Florida Statutes (2015), mandates that all sentences of death be commuted to life in prison without the possibility of parole. Id. at 65-66. We

- 31 -

In <u>Mosley v. State</u>, 41 Fla. L. Weekly S629, S640 (Fla. Dec. 22, 2016), we held that <u>Hurst</u> applies retroactively to those postconviction defendants whose sentences became final after the United States Supreme Court's 2002 decision in <u>Ring</u>. There is no dispute that McGirth's death sentence became final during this time frame.[16] Thus, McGirth falls into the category of defendants to whom <u>Hurst</u> is applicable. Accordingly, at issue is whether the error that occurred during McGirth's penalty phase proceedings was harmless beyond a reasonable doubt. In the context of a <u>Hurst</u> error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to the sentence.

We conclude that the State cannot meet this burden. Although the prior violent felony aggravating circumstance was found unanimously by the jury by virtue of McGirth's conviction for attempted first-degree murder of James Miller, whether this aggravating circumstance was "sufficient" to qualify for the death penalty would also be a jury determination. Because the jury vote was eleven to

reject a similar claim raised by McGirth in his appeal from the denial of postconviction relief.

16. Further, we note that McGirth presented a <u>Ring</u> challenge both on direct appeal and in his motion for postconviction relief.

one, there is no way of knowing if such a finding was unanimous. The same rationale applies to the aggravating factor that the murder occurred during the commission of a robbery. Moreover, there is no way of knowing if the jury found any of the other aggravating circumstances unanimously, or if any aggravators that were unanimously found were also unanimously found to be sufficient to qualify for the death penalty.

Further, this was not a case that completely lacked mitigation. McGirth was only eighteen years old at the time of the murder, the bare minimum age to be eligible for the death penalty. See Roper v. Simmons, 543 U.S. 551, 568 (2005). The trial court gave "significant" weight to this statutory mitigating circumstance. McGirth, 48 So. 3d at 784. Additionally, among the evidence that the jury heard in mitigation was that McGirth did not know his father while he was growing up, he was devastated by the death of his grandmother, and he was a witness to domestic violence. As with the aggravators, there is no way to know whether the jury unanimously found that any mitigation established during the penalty phase was outweighed by the aggravation.

In sum, any attempt to determine what findings were made by the one juror who voted for life and the eleven jurors who voted for death would amount to speculation, and cannot rise to the level of proof beyond a reasonable doubt. Accordingly, the error in this case cannot be considered harmless.

## CONCLUSION

For the foregoing reasons, we affirm the denial of postconviction relief.

However, we grant the petition for writ of habeas corpus, vacate McGirth's death

sentence, and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., and PERRY,
Senior Justice, concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which
CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision to affirm the denial of postconviction

relief. However, I dissent to the majority's decision to grant the habeas petition

and order a new penalty phase proceeding based on Hurst v. State, 202 So. 3d 40

(Fla. 2016).

CANADY, J., concurs.

Two Cases:

An Appeal from the Circuit Court in and for Marion County,
    Brian David Lambert, Judge - Case No. 422006CF002999CFAXXX
And an Original Proceeding – Habeas Corpus

Robert Friedman, Capital Collateral Regional Counsel – North Region, Alice B.
Copek, Karin Lee Moore, and Stacy Rowell Biggart, Assistant Capital Collateral
Regional Counsel – North Region, Tallahassee, Florida,

for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

for Appellee/Respondent