# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D16-5875
_____

ANTHONY PAUL PEOPLES, JR.,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Escambia County.
Thomas V. Dannheisser, Judge.

July 9, 2018

B.L. THOMAS, C.J.

In 2013, Appellant stabbed nineteen-year old Tyquon Prim, plunging the knife more than six inches into Prim's chest. Prim said, "I think I'm going to die," as he staggered to a witness, collapsed, and died. Appellant was charged with second-degree murder.

Appellant waived his right to a jury trial. Appellant eventually participated in a bench trial, resulting in his second-degree murder conviction and life sentence. He now argues that his behavior and indecision as to whether to enter a no contest plea and whether to waive his right to a jury trial should have again resulted in a reconsideration of his competency and another delay in his trial. He further asserts the trial court should not have accepted his waiver of a jury trial. Finally, he

argues that the evidence of his actions stabbing the young man to death was not sufficient to show "ill will, hatred, evil intent or spite."

## I. FACTS AND PROCEEDINGS AT TRIAL

Appellant was not brought to trial until December 2016. In the three intervening years between the fatal stabbing and trial, Appellant received treatment to restore his competency, appeared before the court several times, and was evaluated by several experts, some of whom opined that Appellant intentionally exaggerated his symptoms and refused medication for the purpose of avoiding trial. Appellant was found competent for trial and was ordered to take his prescribed medication, but when he continued to refuse, the court ordered involuntary medication by injection. This court denied Appellant's petition for review of that order without opinion. *Peoples v. State*, 205 So. 3d 594 (Fla. 1st DCA 2016) (table).

When the date of jury selection arrived, defense counsel indicated that Appellant had been found competent by a defense expert the previous week and there was no reason to believe otherwise. Appellant appeared and said he wanted to "behave" and "cooperate," but wanted to present an insanity defense and had not been told by defense counsel what his defense would be. The court noted that a notice of insanity defense had not been filed; the State explained it was because Appellant refused to cooperate with the experts sent by his counsel for the purpose of preparing such a defense. Appellant said he had not been cooperating because his medication had not been helping, and he wanted more time to talk to his counsel about his defense.

Appellant wavered when asked if he wanted to have a jury or bench trial, but when the attorneys and the court discussed jury selection, Appellant emphatically stated he did not want a jury trial and felt it was in his best interest to have a bench trial. The court inquired as to whether Appellant understood the rights he was waiving, and Appellant indicated he did. However, Appellant also stated, "[T]here's two things that I want done is— is to have a judge trial, and . . . and to plead my insanity." Later in the colloquy, Appellant again said he understood his decision

and did not need more time to discuss the issue, but said, "I understand I want a judge trial as far as my insanity goes." After the court concluded its inquiry and confirmed with jail staff that Appellant was current on his medication, it accepted the waiver of jury trial. Appellant signed a written waiver.

The bench trial was set for the following day. At the start of proceedings, Appellant indicated he wanted to enter a no contest plea rather than go forward with the trial. The court stated that Appellant appeared competent and accepted Appellant's plea after conducting a colloquy, noting that the "presumptive sentence" without a downward departure was twenty-one years' imprisonment. However, after the court proceeded to sentencing and the State announced it was seeking a life sentence, Appellant interrupted and stated that he would not take a life sentence, but rather believed he would get the lowest permissible sentence if he entered a plea.

The parties indicated they were prepared to proceed to trial, but Appellant stated he did not want a trial and said he understood that twenty-one years' imprisonment was the minimum sentence he could receive without a departure, and life was the maximum. After Appellant satisfactorily answered additional plea colloquy questions, the court again accepted Appellant's no contest plea; however, when the court imposed a life sentence, Appellant again interrupted and asked if he could have a trial. While the court was concerned about how to proceed, it did not think that Appellant's indecision suggested a competency issue, stating, "I'm not dealing with competency. I'm talking about a defendant who goes back and forth about the waiver of their right to a trial, so that's my—I don't think there's any issue as to his competency."

The State noted Appellant's history of malingering, and the defense acknowledged records showing that Appellant "exaggerates and manipulates." The court concluded that the safest course of action would be to allow Appellant to withdraw his plea and proceed with the bench trial.

During the bench trial, Larry Smith, the owner of the Hotel Liquidation Center, testified that while standing outside his business, he saw a black male wearing a red top approach,

carrying something that looked like a jigsaw tool. The man ran across the street and out of view. Seconds later, a different black male ran up to Smith with his hands on his chest, bleeding, and fell over. The injured man said, "I think I'm going to die." Smith called for help, and John Flynn and Victor Jose arrived. Flynn followed the man who had passed by, and Jose looked after the injured man while Smith called for police and an ambulance. While on the phone with police, Smith got into his truck to pursue the man. Smith saw Flynn pointing to a house, saying that's where the man was. Flynn got in Smith's truck, and they watched the man enter and exit the house. They gave police the address, and police quickly arrived. Smith saw police take the man into custody, and noticed that at that time he was wearing a blue top. Smith testified that he did not recognize either of the two men and he did not hear any yelling or other noise before the incident.

John Flynn was working at Hotel Liquidation when he heard Smith call his name. Flynn ran to the front of the building and saw a man in red running across the street and through a grassy area. Flynn ran after the man. The man ran behind two homes, and Flynn briefly lost sight of him. When he came into view again, Flynn noticed the man was wearing a blue shirt and had something red in his hand. Flynn did not see what the man did with the red shirt, but he did see him throw something. The man ran inside one of the houses. Smith arrived in his truck, and they saw the man come in and out of the house. Police arrived and took the man into custody.

Deputy Busbee testified that officers were dispatched to the reported stabbing at 10:20 a.m., and he arrived at the scene just minutes later. When he arrived, he was waved down by two individuals in a truck, who pointed him toward an individual wearing a blue shirt and blue jeans, heading into a residence. Deputy Busbee took the man into custody and identified him as Appellant. Deputy Busbee learned that Appellant's grandmother lived at the residence.

Officer Hall testified that his K-9 picked up a track near Hotel Liquidation and followed it to a residence. The dog alerted to a porch and attempted to get under the porch. Officer Hall

4

looked under the porch and saw a knife. From there, the dog tracked to the location where Deputy Busbee had Appellant in custody.

A crime scene technician recovered a large kitchen knife, covered in what appeared to be blood, from underneath the porch at a residence. The blade of the knife was seven inches long. In a trash can near the back yard of the residence, the technician found a red sweater with suspected blood on it. These items were sent for analysis. Another crime scene analyst responded to the hospital and attended the victim's autopsy. A DNA sample was taken from the victim, who had an oval wound approximately one inch wide and two inches long on his chest.

Investigator Jackson made contact with Appellant after his arrest. Appellant had a stain on his shirt that appeared to be blood. Appellant told the investigator he cut his hand on a rake. A test of the stain indicated it was Appellant's blood. When the investigator asked Appellant about a red sweatshirt, Appellant denied owning one.

Investigator Jackson showed Appellant a picture of the victim, and Appellant said he "looked like a punk." When the investigator became aware that Appellant had been previously detained under the Baker Act, he asked if Appellant knew right from wrong. Appellant said he did.

A DNA analyst tested samples from the knife and a red sweatshirt; both tested positive for the presence of blood. The knife handle did not return DNA results, but the blood on the knife and the sweater matched the victim. The analyst also swabbed the sweater for skin cells to determine who was wearing it, and obtained a mixture of two individuals; Appellant's DNA matched one of those profiles, and the victim was excluded as a contributor.

Dr. Minyard, a medical examiner, performed the autopsy and concluded the stab wound collapsed the victim's lung and caused heavy bleeding. The depth of the stab wound was six and one-half inches. The knife was plunged through the victim's rib cage and right lung, collapsing the lung. The direction of the

wound was from front to back, from the left side of the chest toward the right side, in a slightly downward movement. The wound caused heavy bleeding into the right pleural cavity. Dr. Minyard examined a knife provided by the sheriff's office and concluded it was consistent with the injury. The cause of death was a stab wound to the chest, and the manner of death was homicide.

After the State rested, Appellant moved for judgment of acquittal, arguing that there was no direct testimony that anyone saw the stabbing, and noting that Appellant's fingerprints and DNA were not found on the knife. The court denied the motion.

Appellant testified that he did not remember stabbing anyone, but that he remembered Prim from "going back to school with him" and "in a dream," but said "nothing never happened aggressive between me and [him]." He denied telling an officer that Prim "looked like a punk."

The court denied the defense's renewed motion for judgment of acquittal. During closing arguments, the defense argued the State had not proven second-degree murder beyond a reasonable doubt, and that "[a]t most it would be a manslaughter charge," but did not elaborate.

The court found Appellant guilty of second-degree murder, declined the defense's request for a downward departure, and imposed a sentence of life imprisonment. The defense noted for the record that it "was not caught off guard" by having to go to trial that day, and that Appellant had repeatedly refused to cooperate with the attempts to pursue an insanity defense. Defense counsel agreed with the court's statement that Appellant "has the capacity to cooperate—when he chooses to."

## II. ANALYSIS

### A. Trial Court's Determination of Appellant's Competency

"The test for whether a defendant is competent to stand trial is 'whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the

6

proceedings against him.'" *Peede v. State*, 955 So. 2d 480, 488 (Fla. 2007) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). If reasonable grounds to question the defendant's competency arise at any material stage of the proceedings, the court must immediately conduct a competency hearing. Fla. R. Civ. P. 3.210(b); see also *Cotton v. State*, 177 So. 3d 666, 668 (Fla. 1st DCA 2015). However, once a defendant has been declared competent, he is presumed competent in subsequent proceedings, and a new competency hearing is necessary only if a "bona fide question as to the defendant's competency has been raised." *Boyd v. State*, 910 So. 2d 167, 187 (Fla. 2005). "[A] trial court's determination of competency supported by competent, substantial evidence will not be disturbed on appeal." *Gore v. State*, 24 So. 3d 1, 10 (Fla. 2009).

This court has rejected mere equivocation as a reasonable ground to question competency. *See Noisette v. State*, 661 So. 2d 350, 350 (Fla. 1st DCA 1995) (concluding the defendant's indecisiveness about whether to testify did not require the court to conduct a second competency evaluation). And while the trial court here was concerned about Appellant's behavior, it specifically found that Appellant's indecision did not create a competency issue.

Appellant argues that the court implicitly acknowledged doubt as to Appellant's competency when it questioned jail personnel to ensure Appellant had received his medication. Appellant asserts that jail personnel's assurance that Appellant was current on his medication was insufficient to alleviate doubt as to his competency, because the record is unclear as to whether he had received both an antipsychotic and a mood stabilizer. However, while Appellant is correct that the testimony from jail personnel does not specify the content of Appellant's injections, there is no suggestion on the record that Appellant was *not* receiving both medications. To the contrary, the witness stated that, other than one dose, Appellant had taken his medication voluntarily since entry of the involuntary medication order.

Even if Appellant had not been taking the mood stabilizer, there was testimony at the involuntary medication hearing that if a liquid mood stabilizer was unavailable and Appellant refused

7

to take it in pill form, it would still be beneficial for Appellant to take only the antipsychotic medication. Given the court's multiple statements that it found Appellant competent, its questioning regarding whether Appellant was current on his medication did not constitute reasonable grounds to require a formal competency hearing, but only a thorough and commendable effort to ensure that Appellant's competency was not in doubt.

Further, defense counsel acknowledged Appellant's history of malingering and repeatedly represented that there was no basis to disagree with the court's findings that Appellant was competent. Indeed, defense counsel noted that Appellant had been evaluated the previous week and found competent. While a court cannot make a new competency determination based only on the stipulations of the parties, *see, e.g.*, *Macaluso v. State*, 12 So. 3d 914, 915 (Fla. 4th DCA 2009), the fact that defense counsel did not request an evaluation and agreed with the court's view of Appellant's competency is a relevant consideration. *See Hodgson v. State*, 718 So. 2d 330, 331 (Fla. 4th DCA 1998) ("Although counsel's failure to request a competency evaluation is not, alone, dispositive, it is evidence that competency to stand trial was not, at that time, in doubt and that defense counsel saw no need for a competency hearing.").

In light of Appellant's history of malingering, the evidence suggesting he was current on his medication, his counsel's representation that he was indeed competent, and the court's observations, the decision not to conduct further competency proceedings was supported by the record and was not an abuse of discretion. *See Barnes v. State*, 124 So. 3d 904, 912 (Fla. 2013); *Gore*, 24 So. 3d at 9.

### B.  *Appellant's Waiver of Jury Trial*

Appellant's second argument is that the trial court failed to ensure Appellant understood what rights he waived when he agreed to a bench trial, including the right to a unanimous jury verdict. In addition, Appellant argues that he was not correctly informed about the role of the judge and jury in determining

facts, and that he mistakenly thought he could raise an insanity defense in the bench trial.

Appellant did not preserve this issue by raising it below. After waiving his right to a jury trial, he did not thereafter move to withdraw that waiver. Because Appellant did not preserve this issue below, we will only consider whether fundamental error occurred in the trial court's decision to allow Appellant to waive his constitutional right to a jury trial. *See United States v. Williams,* 559 F.3d 607 (7th Cir. 2009) (holding that where defendant failed to challenge his jury-trial error below, court considered issue raised for the first time on appeal under "plain error" standard). We consider the federal "plain error" standard as similar to Florida's "fundamental error" standard, although we recognize the two concepts are not identical. *Compare Puckett v. United States,* 556 U.S. 129, 135-136 (2009) (discussing, in the context of a claim that government breached plea agreement, four prongs of federal test for plain error, and noting that appellate review is "strictly circumscribed") *with Maddox v. State,* 760 So. 2d 89, 95-96 (Fla. 2000) (discussing fundamental sentencing errors in the context of the Criminal Appeals Reform Act of 1996, noting that fundamental errors may be addressed on appeal where the error "'reaches down into the validity of the trial itself to the extent that *a verdict of guilty could not have been obtained without the assistance of the alleged error*'") (emphasis added) (quoting *Gudinas v. State*, 693 So. 2d 953, 961 (Fla. 1997)).

First, we clarify the issues involved. When a defendant challenges the *adequacy* of the jury-waiver inquiry, he asserts that the trial court failed to conduct a legally sufficient colloquy. When a defendant challenges the *voluntariness* of the waiver, he asserts that, notwithstanding the adequacy of the court's inquiry, the waiver was not in fact knowingly and voluntarily made. While courts address the adequacy of the jury-waiver inquiry on direct appeal, challenges to the voluntariness of the waiver are properly made by postconviction motion. *Compare Christie v. State*, 737 So. 2d 1157, 1158 (Fla. 1st DCA 1999) (holding that challenge to adequacy of inquiry for waiver of jury trial should have been raised on direct appeal, rather than in a postconviction motion), *Morris v. State*, 680 So. 2d 544 (Fla. 1st DCA 1996)

(reversing inadequate jury-trial waiver on direct appeal where defendant orally affirmed that he wanted to waive jury trial, but the court made no further inquiry and no written waiver was filed), *and Upton v. State*, 644 So. 2d 181 (Fla. 1st DCA 1994) (reversing conviction on direct appeal because written waiver of jury trial signed only by defendant's attorney was inadequate without further inquiry as to whether defendant concurred in the waiver), *with Schwab v. State*, 814 So. 2d 402 (Fla. 2002) (considering postconviction defendant's claim that he did not knowingly, intelligently, and voluntarily waive his right to a jury), *Chacon v. State*, 735 So. 2d 569 (Fla. 2d DCA 1999) (stating that challenge to whether a jury-trial waiver was freely and knowingly given is cognizable in a postconviction motion), and *Parker v. State*, 636 So. 2d 794 (Fla. 1st DCA 1994) (concluding that written waiver was legally sufficient, and any challenge to whether waiver was in fact freely and knowingly given should be raised in postconviction motion).

Appellant appears to challenge both the adequacy of the waiver, because the colloquy purportedly lacked two essential inquiries, and its voluntariness, because it was based on his mistaken belief that the insanity defense would be available to him in a bench trial.

Appellant argues the jury waiver colloquy lacked two essential inquiries—whether Appellant understood the roles of jury and judge in a bench and jury trial, and whether he understood a jury verdict required unanimity. However, while it is the better practice for trial courts to use both a thorough on-the-record waiver and a written waiver, either is legally sufficient. *Tucker v. State*, 559 So. 2d 218 (Fla. 1990). Indeed, where the record contains a written waiver of jury trial signed by the defendant, no further inquiry by the court is required. *See, e.g.*, *State v. Upton*, 658 So. 2d 86, 87 (Fla. 1995) ("When the record contains a written waiver signed by the defendant, the waiver will be upheld."); *Zinnerman v. State*, 985 So. 2d 672, 674 (Fla. 2d DCA 2008) (noting that an "unadorned written waiver" is legally sufficient); *Parker*, 636 So. 2d at 795 (concluding that written waiver executed in conformity with Florida Rule of Criminal Procedure 3.260 is legally sufficient, and trial court's failure to make any inquiry to establish voluntariness of the

waiver did not require reversal). Here, the record contains a formal written waiver signed by Appellant pursuant to rule 3.260, *and* additional inquiry by the court into Appellant's understanding of the waiver. Thus, the trial court's inquiry was adequate as a matter of law.

As to the voluntariness of the colloquy, even if this argument could be raised on direct appeal, we would reject it. Appellant relies principally on an attempt to analogize to several cases in the context of a plea colloquy—not a jury waiver. He argues that, as in cases where the defendant refers to a possible defense during a plea colloquy, the court has a duty to inquire further to ensure that the waiver of defenses, when the defendant waives the right to a jury trial, is knowing and voluntary. *Davis v. State*, 605 So. 2d 936 (Fla. 1st DCA 1992) (explaining that where a defendant claims a defense during the plea proceeding, the court is "obligated to inquire further, to determine whether a defense exist[s], and if so, whether [defendant] was aware of, and knowingly waived, such possible defense."); *State v. Kendrick*, 336 So. 2d 353 (Fla. 1976); *Lyles v. State*, 316 So. 2d 277 (Fla. 1975); *Williams v. State*, 316 So. 2d 267, 271 (Fla. 1975). Appellant claims that, by analogy, the court was obligated to inform him that the insanity defense was not available in either a bench or jury trial, and that because the court did not do so, his jury trial waiver was invalid, like the waivers of defenses in *Davis, Kendrick, Lyles,* and *Williams*. This analogy fails for several reasons.

First, as recognized in *Dumas v. State*, 439 So. 2d 246, 250 (Fla. 3d DCA 1983), there is a "crucial distinction" between the consequences of a guilty plea and those of a jury trial waiver. The *Dumas* court recognized that "[w]hile a guilty plea ends in judgment, jury waiver is often a tactical decision," and the Florida Rules of Criminal Procedure reflect this difference, establishing "more stringent requirements for a valid guilty plea than for a valid waiver of jury trial." *Id.* at 250-51. Second, while the plea decisions discussed in the cases cited by Appellant involved the trial court's failure to ensure the defendants knowingly waived *available defenses*, Appellant was not waiving an available defense by electing a bench trial, as he could not raise an insanity defense regardless of how he proceeded to trial.

11

Third, to the extent the court was required to cure Appellant's misconception, the court did state on the record, in Appellant's presence, that there had been no notice of an insanity defense, and Appellant appeared to acknowledge the issue, saying that he had not cooperated with the experts sent by his defense counsel. Thus, this argument is without merit.

## C. *Sufficiency of Evidence Proving Second-Degree Murder*

In our review of the sufficiency of the evidence, all evidence is viewed in the light most favorable to the verdict, and all inferences are interpreted in favor of the verdict. *See Lynch v. State,* 293 So. 2d 44, 45 (Fla. 1974). Here, it is helpful to compare the elements of the greater crime of *premeditated* first-degree murder—a capital crime punishable by death—with second-degree murder, which is not a capital felony. *Compare* § 782.04(1)(a), Fla. Stat. (2013) ("The unlawful killing of a human being[,] . . . [w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being . . . is murder in the first degree and constitutes a capital felony[.]") *with* § 782.04(2), Fla. Stat. (2013) ("The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, *although without any premediated design* to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree[.]") (Emphasis added).

The evidence required to prove premeditation has been defined by our supreme court:

> Premeditation is more than a mere intent to kill; it is a fully formed conscious purpose to kill [which] may be *formed a moment before the act* but must exist for a sufficient length of time to permit reflection . . . . Whether or not the evidence shows a premediated design to commit a murder *is a question of fact . . .* which may be established by circumstantial evidence.

*Roberts v. State,* 510 So. 2d 885, 888 (Fla. 1987) (quoting *Wilson v. State,* 493 So. 2d 1019, 1021 (Fla. 1986)) (emphasis added). Moreover, premeditation "may be evinced by the defendant's actions in choosing and transporting a certain weapon and

employing that weapon in performance of the killing." *Floyd v. State*, 850 So. 2d 383, 397 (Fla. 2002) (citations omitted).

As the supreme court recognized in *State v. Bryan,* 287 So. 2d 73, 76 (Fla. 1973), in reversing this court's decision that the trial court erred in failing to give the standard jury instruction's definition of "ill will, hatred, spite, or evil intent," jurors understand what constitutes second-degree murder, because jurors understand what kind of action demonstrates a "depraved mind" with no regard for another person's right to life: "It is frankly our view that the average juror pretty well understands what a depraved mind is, and particularly where it is noted at least in partial definition as one which has no regard for human life." *Id.* As the court noted*,* certain acts are so obviously inherently dangerous and fit squarely within the legislature's definition of an act "imminently dangerous to another and evincing a depraved mind regardless of human life although without a [premediated] design to effect the death of any particular individual." *Id.* at 74 n.2 (quoting Fla. Std. Jury Instr. (Crim.)). In *Bryan,* the court held that the act of striking another person with a loaded pistol that discharged and killed the victim was such an act. *Id.* at 76. Although the court noted that some "trouble" had previously arisen between the parties, that fact was not cited as a necessary prerequisite to finding the act itself constituted second-degree murder. *Id.* at 73. Here, the act of plunging a seven-inch knife more than six inches into another person's chest also fits squarely within the legislature's definition of an act imminently dangerous to another, showing a depraved mind with no regard for the victim's right to life.

We recognize that, notwithstanding the supreme court's later holding in *Bryan,* the supreme court in 1934 held that the concept of "actual malice" necessitates that the State prove additional elements not enacted by the legislature, but somehow embedded in the statutory definition:

> Ramsey was charged with the offense of murder in the second degree, one element of which offense is the evincing of a depraved mind in the act of killing the deceased. Depravity of mind is an inherent deficiency of moral sense and rectitude.

13

It is the equivalent of the statutory phrase 'depravity of heart' which has been defined to be the highest grade of malice.

The legal and technical sense of the word 'malice' differs from its sense in ordinary or common speech. In the technical sense it is a term of art importing wickedness and excluding a just cause or excuse. When so used it denotes a wrongful act done intentionally without just cause or excuse.

That definition may be inaccurate because no just cause or excuse can be allowed for a wrongful act. Malice in law refers to that state of mind which is reckless of law and of the legal rights of the citizen in a person's conduct toward that citizen.

It includes all acts wantonly or willfully done, that is, which any man of reason, knowledge, and ability must know to be contrary to his duty. It is implied from wrongful unjustifiable acts done on purpose or without just or legal excuse.

It is obvious, therefore, that the phrase 'evincing a depraved mind regardless of human life,' as used in the statute (Comp. Gen. Laws 1927, § 7137) denouncing murder in the second degree, was not used in the legal or technical sense of the word 'malice' as above defined. The phrase conveys the idea of 'malice' in the popular or commonly understood sense of ill will, hatred, spite, an evil intent. It is the malice of the evil motive which the statute makes an ingredient of the crime of murder in the second degree.

*Ramsey v. State,* 114 Fla. 766, 767-68 (Fla. 1934) (citations omitted).

This court has held that the State must prove both the statutory elements of second-degree murder and "ill will, hatred, spite or evil intent." *See, e.g., Rasley v. State,* 878 So. 2d 473, 477

14

(Fla. 1st DCA 2004); *Davis v. State,* 397 So. 2d 1005, 1006-07 (Fla. 1st DCA 1981). While many cases rely on the Standard Jury Instructions in Criminal Cases for authority to support requiring the State to prove additional elements not required by the Legislature, this development in the law has occurred over many decades. *See e.g., State v. Ellison,* 561 So. 2d 576, 577 (Fla. 1990) (citing Fla. Std. Jury Instr. (Crim.) to affirm this court's holding that defendant, driving at high speed to avoid police, crashing through blocked toll gate at 65 mph, losing control of car, and killing 16-month-old child, was not sufficient evidence of ill will, spite, hatred or evil intent); *Light v. State,* 841 So. 2d 623, 625 (Fla. 2d DCA 2003) (citing Fla. Std. Jury Instr. (Crim.), and noting that instruction incorporates definition of malice explicated in *Reed v. State,* 837 So. 2d 366 (Fla. 2002), a case involving definition of aggravated child abuse).

In *Hines v. State,* this court discussed the difference between premeditated murder and depraved-mind murder, where the defendant pointed a gun at his girlfriend, told a "joke," and shot her, killing her. 227 So. 2d 334, 335 (Fla. 1st DCA 1969). Hines was convicted of premeditated first-degree murder, but this court reversed with direction to reduce the charge to second-degree murder:

> The essential distinction between first and second degree murder is the absence of the element of premeditation in second degree murder. 16 Fla. Jur., Homicide, Section 16. The evidence here clearly sustains a charge of murder in the second degree, i.e., the killing of human being, perpetrated by an act imminently dangerous to another and evincing a depraved mind regardless of human life. Section 782.04(2), Florida Statutes, F.S.A. The act of the defendant in pointing the gun at the head of the deceased was clearly imminently dangerous to human life.

> The more difficult question is whether the act causing the death evinced a depraved mind regardless of human life. 'Depraved mind' within the second degree murder statute has been variously defined as importing malice in the sense of ill will, hatred, or evil intent, and as an

15

inherent deficiency of moral sense and rectitude. *Ramsey v. State*, 114 Fla. 766, 154 So.2d 855. It has also been stated that malice is not limited in its meaning to hatred, ill will and malevolence, but 'denotes a wicked and corrupt disregard of the lives and safety of others * * * a failure to appreciate social duty.' 40 Am.Jur.2d, Homicide, Section 50.

227 So. 2d at 335-36.

In *Smalley v. State,* the Fifth District stated:

A conviction for second degree murder requires proof that the defendant killed the victim with a depraved mind regardless of human life. *See* § 782.04(2); *Roberts v. State,* 425 So.2d 70, 71 (Fla. 2d DCA 1982). In turn, proof of a depraved mind *may* be established by proof the shooting was done with "ill will, hatred, spite, or an evil intent." *See Sigler v. State,* 805 So.2d 32, 34 (Fla. 4th DCA 2001); *Rayl v. State,* 765 So.2d 917, 919 (Fla. 2d DCA 2000).

889 So. 2d 100, 102 (Fla. 5th DCA 2004) (emphasis added).

In this case, there was competent, substantial evidence from which the trier of fact could find that Appellant did act out with ill will, hatred, spite, or an evil intent when he stabbed the victim. Initially, we recognize that the circumstantial evidence here was sufficient as a matter of law to prove Appellant possessed the requisite mental state—no one "accidently" or "negligently" plunges a seven-inch knife blade six inches into the chest of another person. *Cf. Wilson v. State,* 493 So. 2d 1019, 1023 (Fla. 1986) (reducing conviction for first-degree murder to second-degree murder where defendant claimed stabbing of five-year-old in chest with scissors was accidental). Circumstantial evidence can be sufficient to prove the elements of second-degree "depraved-mind" murder. *Dellinger v. State,* 495 So. 2d 197 (Fla. 5th DCA 1986) (en banc). In *Dellinger*, the lack of direct evidence did not preclude a conviction for second-degree murder in light of the circumstantial evidence:

16

There may be, as in this case, little express testimony concerning a defendant's malice or depraved state of mind. However, we think the jury could have inferred this necessary element of second degree murder from the evidence in this case. Here Dellinger pointed a rifle at his wife without knowing (and thus without caring) whether or not it was loaded, and then deliberately pulled the trigger, killing her. We think those facts permitted the jury to infer Dellinger had a "depraved mind regardless of human life" when he fired the rifle.

*Id.* at 198-99.

Thus, the circumstances surrounding the fatal act can prove ill will, spite, hatred or evil intent. *Leasure v. State,* 105 So. 3d 5, 16-17 (Fla. 2d DCA 2012) (affirming denial of defendant's motion for judgment of acquittal in circumstantial-evidence prosecution for second-degree murder, where evidence of three gunshot wounds to victim and other evidence was inconsistent with defendant's claim of self-defense).

Here, in addition to Appellant's use of a deadly weapon to stab the victim—an act which itself could be sufficient to infer the requisite intent, *cf. Gibbs v. State*, 904 So. 2d 432, 435 (Fla. 4th DCA 2005) (concluding that the act of pointing a loaded gun at victim's head and shooting evinces a depraved mind)—the evidence here showed that Appellant was familiar with the victim before the stabbing and thought he "looked like a punk." The trier of fact could reasonably infer enmity from Appellant's description of the victim, his admission that the two had attended school together, and the nature of the act which resulted in the victim's death. The evidence was sufficient to demonstrate that the act of stabbing was an "act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premediated design to effect the death of any particular individual." § 782.04(2), Fla. Stat. (2013).

## III. CONCLUSION

Appellant's vacillating while making jury waiver and plea decisions did not give rise to reasonable grounds to question his

17

competency, and the trial court was therefore not required to conduct additional competency proceedings. Further, the inquiry surrounding Appellant's waiver of jury trial was adequate, as the court conducted an oral colloquy in addition to Appellant's written waiver. Finally, the evidence presented was sufficient to prove Appellant acted with ill will, hatred, evil intent or spite when he stabbed the victim. Appellant's judgment and sentence for second-degree murder is AFFIRMED.

WOLF and RAY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Andy Thomas, Public Defender, Glen P. Gifford, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, Samuel B. Steinberg, Assistant Attorney General, Tallahassee, for Appellee.