# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D17-4086

———————————————

JEFFREY ALAN MACKEY,

    Appellant,

v.

STATE OF FLORIDA,

    Appellee.

———————————————

On appeal from the Circuit Court for Duval County.
Marianne L. Aho, Judge.

August 14, 2019

B.L. THOMAS, J.

Appellant was tried and convicted of second-degree murder for killing his ex-wife.[1] Appellant raises three issues on appeal, which we discuss below as two related issues.

### *Facts*

A co-worker and friend of the victim testified that the victim had confided in her that she did not want a sexual relationship with Appellant. She testified that Appellant would visit the

---

[1] Appellant and the deceased were married from 1986 to 1991 and had two children together. From 1996 to 2006, Appellant was married to another woman, who lived in Missouri at all times relevant to this appeal; Appellant and that ex-wife had one son.

victim's work, where the victim would introduce him as her "roommate" or "friend." The victim told Appellant she wanted to move out of the Jacksonville home he provided to her, but the victim was concerned about how Appellant would receive this news. Appellant returned from Missouri to discuss the matter with the victim. That evening, the witness received a text from the victim indicating that everything was fine and that Appellant had even agreed to keep paying rent on the home so the victim could live there while he stayed in Missouri.

The matter seemed resolved, but the victim did not show up for work and the witness grew concerned. She went to the victim's home to check on her welfare and saw the victim's car but no sign that anyone was home. The witness filed a missing person report.

When law enforcement did a wellness check at the home, they found no body or any sign of foul play. A detective found the victim's cell phone and car keys in the home. Detectives learned Appellant was the victim's ex-husband, and that he had traveled to Missouri to visit his son and other ex-wife. Detectives traveled to meet Appellant, arriving in Missouri at around 3 a.m. They asked for Appellant's consent to search the Jacksonville home, which he freely gave.

Appellant was initially very cooperative with police; he drove his own car to a local sheriff's office and gave a statement to detectives. The detectives did not have probable cause to arrest Appellant or to search his ex-wife's property in Missouri. In his first interview, Appellant pretended he had no idea where the victim might be. When asked if Appellant thought law enforcement might find a body, he said "I hope not." Appellant also told the detectives that he urged one of his sons born during his marriage with the victim to try to reach the victim by text. Appellant himself texted the victim while driving back to Missouri on the night of her disappearance.

During the interview with police, Appellant claimed to suffer from short-term memory loss due to early-onset Alzheimer's disease. The testifying detective saw no sign of this condition and Appellant had no difficulty with dates and timelines.

2

Appellant described his post-divorce relationship with the victim as amicable, telling detectives how happy the victim was with him and their housing arrangement. He claimed the victim would introduce him to her coworkers as her "sweetie." Appellant told the detectives that the victim's promiscuity was a reason for their divorce, and that the victim had been using an online dating service and seeing other men before her disappearance. Appellant said he had called one man who lived in Michigan and told him to stop communicating with the victim. He told detectives that shortly before the victim's disappearance, she went on a date and engaged in sexual activities with a man named Hunter. Detectives later confirmed that the victim had in fact spent time with a man by that name.

But Appellant also made false statements about men in the victim's life. He told detectives that the last time he saw the victim, she was leaving with a "biker," a scenario he later admitted was false.

When police returned to search the victim's home, a cadaver dog alerted at the deceased's bed, although the bed appeared undisturbed. A detective testified that police found no evidence of blood or foul play on the bed or in the home. Police investigated the trailer park's trash-disposal arrangement, learning that tenants had to pay a fee and get help from a park employee to access locked garbage dumpsters. Appellant had not paid any fee and had not used the dumpsters during the relevant time-frame.

Appellant's ex-wife from Missouri testified that Appellant had reunited with the victim about a year before the victim's death. She stated that Appellant often complained that the victim treated him poorly that year and never appreciated all he did for her. The witness testified that she urged Appellant to discontinue the relationship.

The ex-wife testified that Appellant promised to help their son attend a graduation event in Missouri shortly before the date of the victim's disappearance. The night before the graduation event, however, Appellant received a text from the victim saying she was moving out of the Jacksonville home. Appellant stated he had to return to Jacksonville, departing the very next morning. Although his ex-wife assumed Appellant would stay in Jacksonville for

3

several weeks, he surprised her by returning quickly to Missouri. She testified that he appeared calm and collected when he returned, and he had brought the victim's dog with him. His explanation for the quick return was that the victim urged him to go back and spend time with his son.

The next day, Appellant took their son to a golf camp. At the time, the witness did not know that the victim's body was in Appellant's trunk.

The ex-wife testified that when law enforcement first contacted her after the victim's disappearance, she asked Appellant what had happened in Jacksonville with the victim, but Appellant insisted that all he knew was his ex-wife had left with a man on a motorcycle she met online. The ex-wife warned Appellant to contact the police and "clear this up because that could lead to something serious."

After purportedly calling the detectives, Appellant suggested that the family should all go out to dinner. At the outing, they dined and joked about the whereabouts of the deceased, wondering "if we'll ever see her again."

Appellant's ex-wife informed police that after Appellant's initial interview, he began making comments about harming himself. Considering Appellant an endangered person and a possible suspect, detectives tracked Appellant to a hotel in St. Augustine. Appellant again voluntarily agreed to talk with law enforcement, but this time the detective provided *Miranda* warnings and advised him of his right to counsel and right to remain silent. He waived his rights and spoke with police.

In his second interview, Appellant told detectives he knew "it was so wrong to cover this up [because] I thought, I am really making a bad mistake." According to Appellant, after their divorce, he and the victim would occasionally engage in sexual intercourse, but the victim would act like she did not enjoy sex with Appellant. He told the detectives that on the evening of her death, the victim told him about an act of oral sex with Hunter, which filled Appellant with conflicting emotions. Appellant said he was "furious" and claiming, "[m]ost guys would have beat her to death." But he stated that he also enjoyed hearing the details of the

4

liaison, and he climbed into bed with the victim that night thinking she would be willing to engage in the same sex act with him.

Appellant told police that the victim grabbed a handgun he had bought her, pointed it at him, and told him to "suck on this." He said that when she put the gun down, he impulsively picked it up and it discharged accidentally, shooting the victim in the head.

Appellant said he thought law enforcement would quickly arrive due to the loud gunshot. He claimed he lay in bed with the victim, hugging her for about an hour, until he realized the police were not coming. He then wrapped the victim's body in a sleeping bag and drove to Missouri with the body in the car. When he arrived in Missouri, he did not tell his ex-wife or son anything about the killing.

After his ex-wife went to work in the morning, Appellant drove his son to an event, with the victim's body still in the trunk. Appellant later buried the body in a large hole near the property and covered it with ten bags of decorative rocks.

Believing detectives had already seized the gun from the ex-wife's home in Missouri, Appellant told police "you guys have the gun? Do you? You don't?" He told the detectives that the gun was in a bedroom in his ex-wife's home in Missouri and repeated "I thought you guys had it." He stated, "I left a bullet there, shell casing. Did they find that?" The detectives informed Appellant they had not.

Appellant denied putting the gun directly against his ex-wife's head. When confronted by the detective about how unlikely it was to shoot the victim in the head without intentionally doing so, especially in the low light of the early-morning hours, Appellant said "right." Yet he continued to deny that he intentionally shot the victim or hurt her in any way.

In the interview recording, the detective confronted Appellant about the lack of any sign of a shooting in the home, asking Appellant if he changed the sheets or did anything to hide the blood. Appellant denied this, but he could not explain why there was no blood on the bed despite the victim supposedly lying there for an hour after her death. Appellant said the victim lost a large

amount of blood onto a pillow that he took and later burned in Missouri. The detective also confronted Appellant about lying to police in his first interview and about allowing the victim to lie in the ground for seven days while Appellant "took the scenic route" back to Florida along the gulf coast, camping out at the beach along the way.

The detective next confronted Appellant about attempting to cover his tracks by sending a text to the victim's phone while she lay dead in his car. Appellant said, "I think I did a lot of covering" and admitted he tried to confuse law enforcement.

The Chief Medical Examiner for Jackson County Missouri testified that the gunshot wound to the back of the victim's head was likely a contact wound. The medical examiner testified that muzzle imprints and skin lacerations caused by direct contact with gunpowder demonstrated that Appellant pressed the gun directly to the victim's skin. The examiner testified that the absence of stippling[2] also demonstrated that the gun barrel was in direct contact with the victim. Most significantly, the presence of soot in the victim's brain demonstrated that the gun was pressed against her head, as soot would be found around the entry point of the wound or dispersed in areas outside the victim's brain if the wound was not a contact wound. Slight decomposition was the only reason the medical examiner could not say definitively that the wound was inflicted with direct gun barrel contact. The examiner testified that the wound was not a "near-contact," "close-range," or "intermediate-range" wound. In the medical examiner's opinion, the manner of death was homicide.

The State's firearm expert testified that the gun used to shoot the victim was a .380 auto-caliber handgun. When tested with the magazine, the gun fired properly. The witness testified that he performed a "trigger-pull" test, which involves a rod placed on the gun's trigger in the vertical position. The test concluded the gun

_____

[2] Stippling occurs when gunpowder is not driven directly into the wound by a contact discharge, but rather burns the skin around the bullet entry. Stippling consists of small red dots near a wound caused by a gun discharge away from the point of entry – in the case of a hand gun, about three feet away.

required 10.5 pounds of pressure to successfully pull the trigger, unlike a "hair trigger" gun with about 2.5 pounds or less of trigger-pull. The witness also testified that the gun had no altered mechanisms or defects which would cause it to discharge without the trigger being pulled.

The State played a video over defense counsel's objection, showing law enforcement locating and exhuming the victim's body in Missouri. The trial court had previously directed that the video not display any nudity, and it did not. The video showed officers removing a sleeping bag from a hole in the ground and then removing the victim's body from the sleeping bag.

Appellant's sole witness was an expert on Alzheimer's as it relates to injuries. The witness had examined Appellant and his case file and had reviewed depositions of Appellant's living ex-wife. The witness confirmed that Appellant had been diagnosed with Alzheimer's before the shooting, and that he had stopped working due to his disability. The witness described Appellant's condition as early-onset Alzheimer's disease, testifying that this condition can affect impulse control and cause "mental inflexibility." The witness opined that Appellant's condition contributed to the "bizarre" behavior of transporting his ex-wife's body to Missouri.

On cross-examination, the witness stated he was not testifying that Appellant's disease caused him to shoot the victim or that Appellant was unable to formulate intent. The witness also acknowledged that false statements were not a condition of early-onset Alzheimer's disease. He acknowledged that Appellant knew the difference between right and wrong.

In the State's closing argument, the prosecutor argued that Appellant "loved the victim to death." He asserted that Appellant was so obsessed with the victim that he provided her a home, bought her gifts, and even disregarded his own son to appease her. He allowed the victim to date other men while he cooked her meals and paid some of her bills; Appellant did anything to keep the victim in his life. The prosecutor argued that the reason Appellant carried the victim's body from Jacksonville to Missouri, rather than putting the body in some remote location along the way, was to keep her close to him even in death.

The prosecutor emphasized that Appellant's expert witness admitted that early-onset Alzheimer's would not exclude an intent to shoot the victim or to evade detection. The prosecutor noted that Appellant took many steps to confuse law enforcement and lied about crucial details. He argued that Appellant could not have laid in bed with the victim because the bed had no blood on it and was undisturbed. The prosecutor also asserted that the only way the gun could have discharged soot into the victim's brain was by a direct contact wound.

The prosecutor argued that although no one could ever know exactly what happened before the shooting, Appellant's intent could be proven by his actions. "Actions speak louder than words," the prosecutor emphasized.

Defense counsel argued that the firearm expert admitted that guns can and do discharge accidentally, and the medical examiner's testimony did not prove that the wound could not have been inflicted by accident. Defense counsel asserted that Appellant's early-onset condition explained his behavior after an accidental shooting, and that the State failed to prove otherwise. Defense counsel emphasized that Appellant was not on trial for what he did with the victim's body *after* the purported accident. Counsel urged the jury to find Appellant not guilty because the shooting was accidental.

*Analysis*

Appellant asserts that the State failed to present sufficient evidence to sustain the second-degree murder conviction. We reject this argument.

Second-degree murder is an unlawful killing committed without premeditation that is perpetrated "by any act imminently dangerous to another and evincing a depraved mind regardless of human life[.]" § 782.04(2), Fla. Stat. (2017). A depraved mind regardless of human life may be established by competent, substantial evidence that the defendant acted with ill will, hatred, spite, or an evil intent. *Peoples v. State*, 251 So. 3d 291, 303 (Fla. 1st DCA 2018). Even without any express testimony about a defendant's malice or state of mind, "the circumstances surrounding the fatal act can prove ill will, spite, hatred or evil

8

intent." *Id.* In *Peoples*, this Court held that competent, substantial evidence demonstrated the requisite mental state, reasoning that "no one 'accidently' or 'negligently' plunges a seven-inch knife blade six inches into the chest of another person." *Id.* at 302. We also observed that the supreme court "held that the act of striking another person with a loaded pistol that discharged and killed the victim" was an act constituting second-degree murder. *Id.* at 301 (citing *State v. Bryan*, 287 So. 2d 73, 76 (Fla. 1973)).

When considering an argument challenging legal sufficiency, we review the evidence presented by the State in a light most favorable to the verdict of guilt. *Robinson v. State,* 267 So. 2d 567, 568 (Fla. 1st DCA 2019); *see also Lynch v. State,* 293 So. 2d 44, 45 (Fla. 1974) ("A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.").

Here, assuming the jury drew all inferences and viewed all evidence adverse to Appellant, the jury could have found that Appellant was obsessed with the victim and provided her a home in hopes she would continue to have sexual relations with him. When Appellant learned she was moving out, he left Missouri almost immediately, dropping his plans to attend an event with his son, so that he could convince the victim to continue living in the home he provided her.

The victim expressed her concerns about Appellant to her friend. The victim considered Appellant her "roommate" or "friend," as the friend testified, contrary to Appellant's claim that she referred to him as her "sweetie." The jury could have concluded from this evidence that the victim did not wish to continue an intimate relationship with Appellant.

Appellant knew the victim was using dating websites and that she had sex with a man the very weekend Appellant dropped his plans in Missouri to travel to Jacksonville for her. But when the victim described the details of her sexual encounter with the other man, Appellant became jealous and angry, later attempting to pressure her to engage in the same sex acts with him to no avail. When Appellant told police that the victim pointed the gun at him and told him to "suck on this," the jury could have found that it

9

was actually Appellant who made that comment to the victim, before pressing the gun against her head and killing her with a single shot.

With the victim bleeding profusely onto her pillow, Appellant, a physician's assistant, quickly wrapped the body into a sleeping bag to prevent contamination of the home, took the bloody pillow and the victim's dog, and fled to Missouri. He left her cell phone and car at the home because he planned to tell law enforcement he did not know where she might be located. With no body and no evidence of foul play, Appellant thought law enforcement would not obtain enough evidence to arrest him. The jury could further have concluded that Appellant showed no remorse when he arrived in Missouri after killing the victim. He drove his son to a graduation event with the victim's body in the car. He bought supplies to cover up the body and buried the victim on nearby property. He enjoyed dinner and alcohol and laughed about the missing victim, knowing he had just shot and killed her.

The jury could ultimately have concluded that, after law enforcement tracked Appellant to the St. Augustine hotel and woke him in the early morning, his confidence shattered, and he confessed. Appellant did not realize that detectives had no gun and no probable cause to search the Missouri home. The jury could have rejected Appellant's self-serving statements that the shooting was an accident, statements inconsistent with Appellant's comments that he was angry, even humiliated, and that another man "would have beat her to death." The jury could have afforded great weight to the medical examiner's testimony that the victim died from a contact wound.

We need not decide whether the evidence of Appellant's guilt was purely circumstantial, because even applying the heightened standard of review set forth in *Orme v. State,* 677 So. 2d 258, 262 (Fla. 1996), all of this evidence was inconsistent with Appellant's hypothesis of innocence. Therefore, it was for the jury to decide whether to return a verdict of guilt or acquit Appellant. *See State v. Law*, 559 So. 2d 187, 189 (Fla. 1989).

Appellant also challenges the court's admission of the video of police removing the victim's body from the hole. Defense counsel argued below that the videotaped evidence was not relevant

10

because Appellant admitted he buried the body, and thus the State had no need or justification to present the evidence.

First, we reject Appellant's argument that the video evidence was not necessary. "[R]elevancy rather than necessity" is the test for admission of potentially inflammatory photographs or video evidence of a crime. *Pope v. State*, 679 So. 2d 710, 713-14 (Fla. 1996). Here, the video evidence of the exhumation was relevant. Although Appellant admitted he transported the body to Missouri and buried it, he also asserted he shot the victim by accident. His partial admission did not bar the State from introducing relevant evidence that could confirm or contradict his inculpatory or exculpatory statements.

Although defense counsel asserted that the sole issue was whether the victim's death was accidental, this understates disputed issues like the manner of death and the explanation for the lack of blood at the crime scene. Defense counsel argued at trial that the gun might have been upside-down when fired, and that the lack of blood was simply due to the blood gathering on a pillow that was later burned. The exhumation video could have helped the jury determine whether to believe Appellant's story or the medical examiner's theory, as the video showed how Appellant attempted to hide the body.

Appellant's theory of the case was that Appellant's actions *after* the shooting were consistent with early-onset Alzheimer's disease, and that the shooting itself was an accident. The State argued that Appellant's actions evinced intent and rational thought, consistent with consciousness of guilt. The exhumation video, which showed the condition of the body in the sleeping bag and the rocks used to cover the hole, could have helped the jury determine whether Appellant was acting rationally or erratically. Considering these disputed issues, the video was not inadmissible on relevance grounds unless its probative value was substantially outweighed by unfair prejudice.

In addition, there was no unfair prejudice in admitting the evidence. The videotape was not particularly gruesome or inflammatory such that the trial court was required to grant a mistrial following its admission. Although the video shows a dead body, and although photographs from the exhumation and autopsy

also provided evidence of the manner of death, the video provided jurors a clear presentation without being overly sensational or needlessly cumulative. See *Nixon v. State*, 572 So. 2d 1336, 1342 (Fla. 1990) (upholding the admission of several photographs of the burned body of the victim, even though cause of death and nature of death had been clearly established). Therefore, the trial court did not commit error in admitting the video or in denying Appellant's motion for a mistrial based on the admission of this evidence.

AFFIRMED.

RAY, C.J, and WINOKUR, J., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

James P. Hill and Jacqueline Rae Luker of Tassone, Dreicer, & Hill, Jacksonville, for Appellant.

Ashley Moody, Attorney General, and Amanda D. Stokes, Assistant Attorney General, Tallahassee, for Appellee.